[No. 48891-1-I. Division One. February 3, 2003.]

PATRICK W. MURPHY, ET AL., *Respondents*, v. THE STATE OF WASHINGTON, *Appellant*.

298

*Christine O. Gregoire, Attorney General,* and *Paul J. Triesch* and *Michael E. Tardif, Assistants,* for appellant.

*Mark S. Northcraft* (of *Northcraft & Bigby*), for respondents.

COLEMAN, J. — Patrick Murphy and his family sued the State for damages they claimed were caused by the Washington State Pharmacy Board's negligent disclosure of Murphy's prescription records to the prosecuting attorney. The disclosure of those records resulted in Murphy's prosecution for obtaining prescription drugs by deceit, but the criminal charges were dismissed because the Board failed to obtain a warrant before examining the records. In the civil trial, the jury found the Board was negligent and awarded Murphy damages he allegedly suffered when stress from the prosecution exacerbated his prior injuries. The main issue on appeal is whether the trial court erred in

holding that the Board had a duty to prevent disclosure of Murphy's prescription information to the prosecuting attorney.

We reverse and dismiss Murphy's claim for negligent disclosure. The trial court erred in holding that the Board needed a warrant to search prescription records; pharmacy records are open to inspection by the Board under state statutes, and those statutes do not violate federal or state constitutional privacy protections. Further, there is no implied statutory cause of action or common law negligence theory that subjects the Board to liability for disclosing Murphy's prescription records to the Snohomish County prosecutor. Given these conclusions, we find it unnecessary to reach the remaining issues raised by the State's appeal, and we affirm the trial court with regard to the issues raised in Murphy's cross-appeal.

## FACTS

Patrick Murphy was hired as Police Chief for the city of Snohomish in 1982. In 1988, Murphy began using prescription pain medicine after he received a jaw injury while on duty. Thereafter, Murphy sustained a number of other injuries for which he was prescribed prescription narcotics. The parties agree that Murphy had a number of legitimate injuries for which pain medication was appropriate.

Murphy was appointed Sheriff of Snohomish County in 1995. Later that year, the Board began an investigation into Murphy's drug use. The investigation began after the Board was contacted by pharmacist Loretta Mounts. Mounts said she filled a prescription for Percocet for Murphy and noticed that he was sweating, had "glassy" eyes, and was short of breath. Mounts called the prescribing doctor, who verified the prescription. The next day, her manager filled another Percocet prescription for Murphy at a different store. After learning of that prescription, Mounts became concerned that Murphy was overmedicating. Mounts contacted four to six other pharmacists who had

filled prescriptions for Murphy. They expressed similar concerns. A few days later, she asked a Snohomish County narcotics officer what she should do about questionable prescriptions written for someone in law enforcement. The officer put her in contact with his commander, Al Schelstad, and she told Schelstad about her concerns regarding Murphy. Schelstad then contacted Donald Williams, the Executive Director of the Board, and told him of Mounts' concerns regarding Murphy.

Williams asked the Board's Chief Investigator, Richard Morrison, to follow up with Mounts. After speaking with Mounts, Morrison asked Board Investigator Phyllis Wene to complete a survey of prescription data from area pharmacies. According to Morrison, this was a standard procedure when conducting investigations.

Wene visited 39 Snohomish county pharmacies and reviewed their prescription records. Such records are required by RCW 18.64.245, which also requires pharmacists to make those records available for inspection by the Board or other law enforcement officers. Wene did not obtain a search warrant. Wene compiled the data she gathered on Murphy into a survey which contained the name and quantity of the controlled substance, the date prescribed, the prescriber's name, and the pharmacy at which the prescription was filled. According to the survey, Murphy had filled 265 prescriptions at eight pharmacies located in three cities over a 17-month period. Ten different prescribers had written those prescriptions. Williams, Morrison, and Wene testified that they were concerned by the overlapping prescriptions for opioid narcotics, muscle relaxants, and antidepressants. They also testified that they thought Murphy or his doctors might be violating prescription drug laws.

In June 1995, Williams, Morrison, and Wene met with several Snohomish County officials, including Chief Criminal Prosecutor James Townsend, County Executive Robert Drewel, and County Council Chair Karen Miller. During the meeting, the Board officials disclosed the results of the

survey, along with their suspicions that Murphy was engaging in behavior that indicated "pill-seeking" and addiction. The Board officials, who were all licensed pharmacists, told the county officials that the survey indicated Murphy was taking an average of 25 dosage units per day of "mind-altering drugs," and that the amount Murphy was taking would affect anyone's ability to safely use a car or carry a weapon. At trial, Murphy's experts testified that the prescription levels Murphy was taking were appropriate for a patient suffering from intractable pain of the kind Murphy had. They also testified that such patients could function normally on pain medication, with the only lasting side effects being constipation. Murphy's experts also testified that none of the Board's conclusions could be drawn from simply reviewing the survey. They also testified that the number of pills taken is a poor indicator of addiction and that the amount of active agent in each pill must be considered to get a true picture of the amount of narcotic being consumed.

The County officials and Board officials present at the meeting agreed that Wene should conduct further investigation. Wene interviewed the prescribers and used a photographic montage to verify that all the prescriptions were written to Murphy. None of the prescribers were aware of the prescriptions that overlapped their own, although several testified that they were aware that Murphy was seeing other physicians for different injuries. After her interviews with Murphy's doctors, Wene reported her findings to the prosecutor.

Attorney Rebecca Roe was appointed as a special deputy prosecuting attorney due to an apparent conflict of interest.[1] Roe filed charges against Murphy seven days before the general election. Murphy lost the election, and the criminal case was subsequently dismissed because the trial court ruled that the Board violated Murphy's right to

[1] Murphy was in the process of running for reelection as Sheriff of Snohomish County, and Townsend was the political advisor and a financial contributor to one of Murphy's opponents in the upcoming primary election.

privacy by examining his prescription records without a warrant. Snohomish County did not appeal that ruling or pursue the criminal matter further.

Murphy filed this suit against the State, alleging that the stress from the criminal charges caused his jaw condition to worsen and become irreversible. The amended complaint alleged civil conspiracy, violation of the Uniform Health Care Information Act, chapter 70.02 RCW (HCIA), and negligent supervision of employees. The Board moved to dismiss the negligent supervision and HCIA claims. The trial court dismissed the negligent supervision claim. With regard to the HCIA claim, the trial court determined that although the Board was not a covered entity under the HCIA, Murphy could proceed on a theory of "negligent disclosure." The jury found that Murphy did not commit a crime and that the Board negligently disclosed his health care information, causing his injuries. The jury awarded Murphy $3.25 million, which was discounted by 20 percent due to Murphy's negligence. The jury also awarded damages to Murphy's wife and three children. The jury returned a defense verdict on Murphy's claim of civil conspiracy against the Board and the Snohomish County prosecutor. This appeal followed.

## DISCUSSION

The primary issue in this case is whether the Pharmacy Board owed a duty of care to Murphy to avoid unauthorized disclosure of his prescription records to the prosecuting attorney. The State argues that Murphy's negligent disclosure claim should have been dismissed because pharmacy records are open to inspection by law enforcement under regulatory statutes. Murphy argues that the Board unlawfully searched and seized his prescription records without a warrant and that the trial court properly allowed his claim for negligent disclosure based on the standard of care enunciated in the HCIA. We hold that the Board had no duty to obtain a warrant before examining Murphy's pre-

scription records. Further, neither the HCIA nor the common law imposed a duty on the Board to prevent disclosure of Murphy's prescription records to the prosecuting attorney.

▮▮▮ The question of whether a duty exists is a question of law, which this court reviews de novo. *Snyder v. Med. Serv. Corp. of E. Wash.*, 145 Wn.2d 233, 243, 35 P.3d 1158 (2001). " 'A duty can arise either from common law principles or from a statute or regulation.' " *Doss v. ITT Rayonier, Inc.*, 60 Wn. App. 125, 129, 803 P.2d 4 (1991). *See also Bernethy v. Walt Failor's, Inc.*, 97 Wn.2d 929, 932, 653 P.2d 280 (1982). In determining whether a legal duty exists, courts look to " 'mixed considerations of logic, common sense, justice, policy, and precedent.' " *Snyder*, 145 Wn.2d at 243 (quoting *Lords v. N. Auto. Corp.*, 75 Wn. App. 589, 596, 881 P.2d 256 (1994)).

In this case, Murphy claims the Board violated two distinct but related duties with regard to his prescription records. First, he argues that the Board did not have the authority to conduct a survey of his prescription records without first obtaining a search warrant. Second, he argues that the Board violated its duty of care by disclosing the results of the survey to the Snohomish County prosecuting attorney.

I. SEARCH WARRANT

The trial court concluded that the Board was not authorized to examine and seize Murphy's prescription records without obtaining a search warrant. The State argues that this conclusion was in error because RCW 18.64.245 (hereinafter the "pharmacy statute") gives law enforcement the authority to inspect prescription records without a warrant. This question of law presents a two-fold inquiry. The first question we must address is whether the laws regulating pharmacies give the Board and other law enforcement agencies the authority to conduct such inspections. The second level of inquiry is whether, assuming the statutes grant such authority, that grant of authority runs afoul of

the right to privacy guaranteed by the federal and state constitutions.

A. Statutory Construction

 The pharmacy statute provides:

Every proprietor or manager of a pharmacy shall keep readily available a suitable record of prescriptions which shall preserve for a period of not less than two years the record of every prescription dispensed at such pharmacy which shall be numbered, dated, and filed, and shall produce the same in court or before any grand jury whenever lawfully required to do so. The record shall be maintained either separately from all other records of the pharmacy or in such form that the information required is readily retrievable from ordinary business records of the pharmacy. All record-keeping requirements for controlled substances must be complied with. Such record of prescriptions shall be for confidential use in the pharmacy, only. *The record of prescriptions shall be open for inspection by the board of pharmacy or any officer of the law, who is authorized to enforce chapter 18.64, 69.41, or 69.50 RCW.*

RCW 18.64.245 (emphasis added). This court has noted that the above statute makes pharmacy records "subject to inspection for law enforcement purposes." *State v. Mark*, 23 Wn. App. 392, 394, 597 P.2d 406 (1979) (holding prescription records not protected by the doctor-patient privilege). But *Mark* is not directly on point because in that case the State had obtained a court order allowing the State to inspect and audit prescription records from a pharmacist after the pharmacist was convicted of collecting reimbursement for fraudulent Medicaid prescriptions. *Mark*, 23 Wn. App. at 394. The question presented by this case is whether the pharmacy statute allows the Board to conduct a warrantless survey of an individual patient's prescription information.

We hold that it does. The purpose of statutory construction is to give effect to legislative intent, and when a statute is unambiguous, we derive its meaning from the plain language of the statute alone. *State v. Glas*, 147 Wn.2d 410, 415, 54 P.3d 147 (2002). Murphy argues that the purpose of

the pharmacy statute is to require record keeping and allow inspection for the purpose of regulating pharmacies, but not to allow a warrantless examination of a patient's prescription records to gather criminal evidence against the patient. But by indicating that the records shall be "open for inspection," the legislature clearly contemplated unrestricted access by the appropriate law enforcement personnel. Further, the Pharmacy statute specifically states that prescription records are "open to inspection" by officers who are "authorized to enforce" the provisions of chapter 69.41 RCW. That chapter does not just regulate pharmacists and doctors, but also makes it a crime for patients to possess certain drugs without a prescription or obtain prescriptions by deceit. RCW 69.41.020-030.[2] Thus, the legislature clearly intended that pharmacy records be available for enforcement of all prescription drug laws—not just those that regulate pharmacists and doctors, but also those that criminalize certain behavior by patients.[3] Because the purpose of the record-keeping requirement is to regulate behavior by those dispensing and using prescription drugs, we interpret the plain language of the pharmacy statute to allow warrantless access for that purpose.

B. Constitutional Provisions

■ ■ Because we have concluded that the pharmacy statute allows the Board warrantless access to patients' prescription records, the next step in our inquiry is to determine whether the pharmacy statute, as we have interpreted it, violates the privacy protections of the federal and state constitutions. We conclude that patients who purchase prescription narcotics from pharmacists have a limited expectation of privacy in the information compiled by pharmacists regarding their prescriptions. But because patients know or should know that their purchase of such

---

[2] Murphy was charged with violating RCW 69.41.020.

[3] Our interpretation of the pharmacy statute is supported by decisions from other states that have interpreted similar statutes. *See State v. Russo*, 259 Conn. 436, 790 A.2d 1132, *cert. denied*, 537 U.S. 879 (2002); *State v. Welch*, 160 Vt. 70, 624 A.2d 1105 (1992).

drugs will be subject to government regulation and scrutiny and because dispensers of prescription drugs have kept similar records open to government scrutiny throughout this state's history, we hold that the pharmacy statute does not violate constitutional privacy protections.

The Fourth and Fourteenth Amendments to the United States Constitution protect criminal suspects from unreasonable searches and seizures. In addition, article I, section 7 of the Washington Constitution provides: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." We begin any analysis under this provision with the proposition that warrantless searches are unreasonable per se, subject to a few " 'jealously and carefully drawn exceptions.' " *State v. Hendrickson*, 129 Wn.2d 61, 70, 917 P.2d 563 (1996) (quoting *State v. Houser*, 95 Wn.2d 143, 149, 622 P.2d 1218 (1980)).

But these constitutional privacy protections are not absolute and must be balanced against the need for comprehensive and effective governmental oversight of prescription narcotic use and distribution. Accordingly, decisions in criminal cases from other states have uniformly held that warrantless searches of pharmacy prescription records do not violate the constitutional privacy rights of patients. In *State v. Welch*, 160 Vt. 70, 624 A.2d 1105 (1992), the Supreme Court of Vermont held that the State did not violate a defendant's privacy rights by conducting a survey of her prescription data, which showed that she had obtained overlapping prescriptions by deceit. The court held that the defendant had a limited expectation of privacy in pharmacy records. *Welch*, 624 A.2d at 1109. The court went on to hold, however, that a search of the pharmacy's prescription records for criminal evidence was justified under the "pervasively regulated industry" exception. *Welch*, 624 A.2d at 1111-12.

In *State v. Russo*, 259 Conn. 436, 790 A.2d 1132, *cert. denied*, 537 U.S. 879 (2002), the defendant was charged with multiple counts of obtaining a controlled substance by forging a prescription. *Russo*, 790 A.2d 1135-36. The court

first determined that Connecticut's pharmacy statute, which contains language similar to Washington's, permitted law enforcement agents to inspect records of prescriptions in order to search for evidence of a patient's criminal activity. *Russo*, 790 A.2d at 1143. The court further held that the defendant's Fourth Amendment right to privacy was not violated when police obtained the defendant's prescription records by consent of the pharmacists who held them: "In other words, a person does not have an objectively reasonable expectation that records of his or her prescriptions for controlled substances will not be disclosed to law enforcement personnel, subject to safeguards against further dissemination of those records, upon an appropriate request for those records by such personnel." *Russo*, 790 A.2d at 1152 (emphasis omitted).

Both *Russo* and *Welch* relied heavily on the Supreme Court's decision in *Whalen v. Roe*, 429 U.S. 589, 97 S. Ct. 869, 51 L. Ed. 2d 64 (1977), in which the Court rejected a privacy rights challenge to a New York law that provided for the centralized storage of prescription data for controlled substances. *Whalen* upheld the New York law against a challenge that it violated the general privacy protections that emanate from the Fourteenth Amendment. *Whalen*, 429 U.S. at 598-600. Murphy argues that *Whalen* is inapposite because the Court expressly limited its holding to the gathering of the information and did not hold that such information was subject to warrantless searches for criminal evidence against a particular patient. But despite this distinction, we read *Whalen* as persuasive authority for the proposition that a patient's right to privacy in prescription records must be weighed against the government's legitimate interest in regulating the sale and consumption of dangerous drugs. *See Whalen*, 429 U.S. at 598.

Murphy also argues that *Russo* and *Welch* should be rejected as incorrect applications of the Fourth Amendment. We note that both cases contained strong dissents. The dissent in *Russo* argued, as does Murphy, that there is a fundamental difference between a regulatory search

aimed at the regulated industry and a search for criminal evidence against an individual patient. *See Russo*, 790 A.2d at 1163 (Sullivan, C.J., dissenting). Accordingly, Murphy argues that while the pharmacy statute allows administrative inspections for the purpose of regulating pharmacists, a warrant is required if the government's purpose is to gather criminal evidence against a patient. *See, e.g., Michigan v. Clifford*, 464 U.S. 287, 297, 104 S. Ct. 641, 78 L. Ed. 2d 477 (1984) (holding investigators, while authorized to conduct administrative search to determine cause of fire, violated Fourth Amendment when they extended their search to gather evidence of arson once fire's cause had been determined).

But there are important distinctions between inspections of prescription records conducted pursuant to pharmacy statutes and the administrative "pretext" searches in the cases cited by Murphy. In some cases, administrative searches have been held to be invalid under the Fourth Amendment because they went beyond the scope of the administrative inspection authorized by law. *See Clifford*, 464 U.S. at 297; *Alexander v. City & County of S.F.*, 29 F.3d 1355, 1360 (9th Cir. 1994). As we have concluded above, however, the pharmacy statute does not just regulate pharmacists. It also directs pharmacists to make their prescription records available for the purpose of investigating criminal activity by patients. In this case, therefore, the purpose of the search was within the scope of permissible inspections authorized by statute—to enforce the prescription drug laws against pharmacists, doctors, patients, or anyone else violating those laws. *See State v. McKinney*, 148 Wn.2d 20, 30, 60 P.3d 46 (2002) (holding police did not violate privacy rights of drivers by accessing Department of Licensing records, in part because such records are created and maintained for law enforcement purposes).[4]

---

[4] We recognize that a patient's prescription information is of a more private nature than the information at issue in *McKinney* and that the *McKinney* court took the nonprivate nature of licensing information into account in reaching its decision. *See McKinney*, 148 Wn.2d at 27-29. But despite this distinction, *McKinney* squarely supports the proposition that the purpose for which records

Murphy further argues that the reasoning in *Russo* and *Welch* should be rejected because the Washington Constitution provides more extensive privacy protections than the Fourth Amendment. We disagree. It is true that in some instances, Washington courts have held that our constitution provides greater privacy protections than the Fourth Amendment. While the protections afforded by the Fourth Amendment may erode over time due to diminishing societal expectations of privacy, article I, section 7 connects the constitutional standard to " 'those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant.' " *State v. Ladson*, 138 Wn.2d 343, 349, 979 P.2d 833 (1999) (emphasis omitted) (quoting *State v. Myrick*, 102 Wn.2d 506, 511, 688 P.2d 151 (1984)). Accordingly, although the fact that otherwise private information is conveyed, by necessity, to a third party might destroy its protection under the Fourth Amendment, Washington cases have held in some instances that such information is not available to the State absent a warrant. *See, e.g., State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986) (holding, contrary to federal precedent, that State violated defendant's privacy rights by recording telephone numbers called, despite fact that phone company retained such information); *State v. Boland*, 115 Wn.2d 571, 578, 800 P.2d 1112 (1990) (holding, contrary to federal precedent, that police could not conduct warrantless search of trash left on curb for pickup).

But just because a state constitutional provision has been subject to independent interpretation and found to be more protective in a particular context, it does not follow that greater protection is provided in all contexts. *McKinney*, 148 Wn.2d at 26; *Ino Ino, Inc. v. City of Bellevue*, 132 Wn.2d 103, 115, 937 P.2d 154, 943 P.2d 1358 (1997).[5] Further, federal precedent is still persuasive in our analysis of state

are created and maintained is an important factor in determining whether their inspection or disclosure violates constitutional privacy protections.

[5] In deciding whether a state constitutional provision is more protective than its federal counterpart in a particular context, we generally consider the six factors outlined in *Gunwall*, 106 Wn.2d at 58. These factors include (1) the textual

privacy protections, and we must consider that no state that has addressed the issue has invalidated pharmacy statutes that grant access to law enforcement, either under the Fourth Amendment or under their own constitutional privacy provisions.[6]

This weight of authority is supported by sound reasoning. When a patient brings a prescription to a pharmacist, the patient has a right to expect that his or her use of a particular drug will not be disclosed arbitrarily or randomly. But a reasonable patient buying narcotic prescription drugs knows or should know that the State, which outlaws the distribution and use of such drugs without a prescription, will keep careful watch over the flow of such drugs from pharmacies to patients. *See Whalen*, 429 U.S. at 598; *State v. Lee*, 62 Wn.2d 228, 233, 382 P.2d 491 (1963) (noting courts are " 'committed to allow the maximum scope of police power in the control of the illegal use of narcotic drugs.' ") (quoting *City of Seattle v. Ross*, 54 Wn.2d 655, 661, 344 P.2d 216 (1959)). *See also McKinney*, 148 Wn.2d at 30.[7]

---

language, (2) differences between the federal and state texts, (3) constitutional history, (4) preexisting state law, (5) structural differences between the texts, and (6) whether the matter is a state or local concern. *Gunwall*, 106 Wn.2d at 58.

A substantial body of independent state jurisprudence has established that the first, second, third, fifth and sixth criteria favor independent analysis under article I, section 7. *See State v. Young*, 135 Wn.2d 498, 509, 957 P.2d 681 (1998). Thus, courts generally focus their inquiry on the historical question of whether preexisting state law supports greater protection than the United States Constitution in a particular context. *Young*, 135 Wn.2d at 509.

[6] In addition to the *Russo* and *Welch* cases discussed above, see *Stone v. City of Stow*, 64 Ohio St. 3d 156, 166, 593 N.E.2d 294, 301 (1992) ("Whatever privacy interest the patients and physicians possess in these prescription records is limited to the right not to have the information disclosed to the general public."); *Hosto v. Brickell*, 265 Ark. 147, 156, 577 S.W.2d 401, 406 (1979); *Mendez v. Ariz. State Bd. of Pharmacy*, 129 Ariz. 89, 92, 628 P.2d 972, 975 (1981); *State v. Rednor*, 203 N.J. Super. 503, 508-09, 497 A.2d 544, 547 (1985); *People v. Doss*, 4 Cal. App. 4th 1585, 1597-98, 6 Cal. Rptr. 2d 590, 598 (1992).

[7] We also note that a warrant requirement would be particularly unworkable in this context due to the fact that pharmacists are likely to be the primary reporters of suspected prescription drug abuse by patients. In the likely event that a pharmacist is relying on information contained in the patient's prescription records, any resulting warrant would inevitably be "tainted" by that information. The very purpose of keeping such records is to allow pharmacists and law enforcement to identify possible abuses and take steps to remedy them.

Further, this is not a case of a long-held privacy protection being eroded by gradual government intrusion or modern technological advances. *Compare State v. Myrick*, 102 Wn.2d 506, 688 P.2d 151 (1984) (holding aerial surveillance violated state privacy clause) *and State v. Young*, 123 Wn.2d 173, 186, 867 P.2d 593 (1994) (invalidating warrantless use of thermal imaging device to detect heat sources within home) *with McKinney*, 148 Wn.2d at 31 (distinguishing *Young* because information originally kept for law enforcement purposes). Pharmacies and drug stores selling narcotics have been required to retain records of sales and make them available to law enforcement since as early as 1891. *See* LAWS OF 1891, ch. CLIII, § 12 (requiring drug stores to keep record of opium sales and other "poisons" and making records open to inspection by prosecuting attorney or Board agent). Given this long history of government scrutiny, patients who fill prescriptions for narcotic drugs in this state should reasonably expect that their prescription records will be available to appropriate government agents, subject to safeguards against unauthorized further disclosure.

We therefore hold that the trial court erred when it concluded that the Board did not have the authority to conduct a survey of Murphy's prescription records without first obtaining a search warrant. We recognize, as have other courts, that patients have a limited expectation of privacy in prescription records. But in this case, that limited expectation was not violated by the State's exercise of its statutory right to inspect such records in order to ensure conformity with prescription drug laws.

II. DISCLOSURE TO THE PROSECUTOR

Having determined that the Murphy's prescription information was lawfully obtained by the Board, the question remains whether it was improperly disclosed. We hold that it was not.

Before addressing the issue that is before this court, we find it helpful to point out what issues are not before us. Murphy has not pleaded a cause of action for invasion of

privacy or negligent investigation. Instead, he has alleged that the Board's unwarranted disclosure of his prescription information caused him harm. Further, although the Board disclosed its survey of Murphy's prescription records to several county officials other than prosecutors, Murphy's claimed damages all flowed from the disclosure to the prosecutor. Accordingly, the narrow issue before this court is whether the Board, which was entitled to inspect Murphy's prescription information, had a duty to prevent disclosure of that information to the prosecuting attorney.

The trial court held that such a duty was created by the HCIA. The HCIA prohibits disclosure of certain health care information by "a health care provider, an individual who assists a health care provider in the delivery of health care, or an agent and employee of a health care provider." RCW 70.02.020. The parties agree that the Board is none of these. Murphy nevertheless argues that the Board should be held to the same standard of care to which health care providers are held under the HCIA. Murphy claims there are two reasons for holding the Board to that standard. First, Murphy argues that language in the preamble of the HCIA indicates that the statute should be adopted by this court as the standard of care for government agencies that have access to sensitive health care information. Second, Murphy argues that the Board adopted the HCIA as its standard of care and therefore was required to abide by it. For the reasons that follow, we reject both arguments.

A. Statutory Duty

A legislative enactment may prescribe a standard of conduct required of a reasonable person, the breach of which may be introduced as evidence of negligence. *Crowe v. Gaston*, 134 Wn.2d 509, 515, 951 P.2d 1118 (1998). In determining whether a defendant owes a duty of care based on a statutory enactment, we rely on the *Restatement (Second) of Torts* § 286 (1965).[8] But in determining whether

---

[8] *Restatement (Second) of Torts* § 286 (1965) provides:

The court may adopt as the standard of conduct of a reasonable man the

section 286 applies, we must first determine what requirements are imposed by the statute. *Melville v. State*, 115 Wn.2d 34, 37, 793 P.2d 952 (1990). As we have noted above, the HCIA imposes no requirements on the Board because the Board is not an entity covered under the HCIA. RCW 70.02.020.

 Murphy argues that RCW 70.02.005(4) imposes a duty on the Board. That portion of the statute lists a number of legislative "findings," including the following:

> Persons other than health care providers obtain, use, and disclose health record information in many different contexts and for many different purposes. It is the public policy of this state that a patient's interest in the proper use and disclosure of the patient's health care information survives even when the information is held by persons other than health care providers.

RCW 70.02.005(4). But this section of the statute does not purport to prohibit specific conduct. Rather, it is a general statement of legislative intent. Such policy statements do not in themselves create enforceable duties. *Melville*, 115 Wn.2d at 38. The trial court therefore erred in concluding that the HCIA created such a duty on the part of the Board.

 This conclusion is in harmony with our interpretation of the pharmacy statute. Reading the two statutes together, it is clear that the legislature never intended the HCIA to apply to the Board in this context, and any attempt to impose the nondisclosure provisions of the HCIA on communications between a state law enforcement agency like the Board and the prosecuting attorney is simply unworkable. The pharmacy statute requires phar-

---

requirements of a legislative enactment . . . whose purpose is found to be exclusively or in part

(a) to protect a class of persons which includes the one whose interest is invaded, and

(b) to protect the particular interest which is invaded, and

(c) to protect that interest against the kind of harm which has resulted, and

(d) to protect that interest against the particular hazard from which the harm results.

macists to keep their records open for inspection by "any officer of the law, who is authorized to enforce" prescription drug laws. The HCIA, in turn, contains an exception which allows disclosure "[t]o federal, state, or local law enforcement authorities to the extent . . . required by law." RCW 70.02.050(2)(b). These statutes, read together, illustrate the legislature's intent to protect patient information from disclosure to the public, but to allow law enforcement access for purposes of enforcing prescription drug laws. Further, it would be unreasonable to interpret the HCIA or the pharmacy statute[9] to prevent free communication between the Board and the prosecuting attorney, who must make the decision of whether to charge a person investigated by the Board. These considerations add further support to our conclusion that the HCIA does not apply to the Board or prohibit the Board from freely disclosing information to the prosecuting attorney.

B. Adoption of HCIA by the Board

Murphy also argues that the Board owed a duty of care to him because officials of the Board testified that they used the HCIA as a guideline for determining when to disclose prescription information. We disagree. Murphy bases this portion of his argument on the principle that one who voluntarily undertakes a duty to protect another from harm must exercise reasonable care in the performance of the duty undertaken. *See Brown v. MacPherson's, Inc.* 86 Wn.2d 293, 545 P.2d 13 (1975); *Meneely v. S.R. Smith, Inc.*, 101 Wn. App. 845, 5 P.3d 49 (2000), *review denied*, 142 Wn.2d 1029 (2001). Murphy argues that the common-law "rescue doctrine" applies by analogy because even if the Board were not required to protect Murphy's health care information from disclosure, its members took upon them-

---

[9] Murphy also argues that by stating that prescription records are for "confidential use in the pharmacy, only" the legislature intended to allow inspection but not seizure of pharmacy records. RCW 18.64.245. But it would make little sense to hold that law enforcement officers may access prescription records, but may not consult with prosecutors regarding what they have observed. In context, it is clear that this portion of the pharmacy statute is directed toward the pharmacists who keep such records, not toward the law enforcement officers who are granted access to the records by the same statute.

selves the responsibility for protecting patient information by using the HCIA to guide them.

This argument fails for several reasons. First, the cases cited by Murphy involved tortfeasors who intervened in a situation in an attempt to help and, in doing so, created some additional risk or invited reliance by the plaintiff. *See, e.g., Brown,* 86 Wn.2d at 299-300 (holding that although State had no duty to warn plaintiff of avalanche danger, State could be liable if it undertook duty by providing information that made situation worse due to its inaccuracy); *Meneely,* 101 Wn. App. at 859-60 (holding organization that promulgated industry-wide safety standard voluntarily undertook duty to warn of known dangers from diving boards). But in this case, Murphy did not rely on any assurances by the Board that it would follow the HCIA, nor has he explained how the Board's use of the HCIA as a guide could have contributed to his injury.

Second, the fact that several individual Board officials testified that they used the HCIA as a guide is insufficient to create a duty on the part of the State that is not otherwise imposed by statute. State agencies are creatures of statute, and their legal duties are determined by the legislature, not by state employees. *See McGuire v. State,* 58 Wn. App. 195, 199, 791 P.2d 929 (1990) (holding state agency could not create duty by making ultra vires promises to state employee purporting to change statutorily mandated civil service exemption). The Board did not adopt the HCIA by regulation or even by official policy. As a matter of law, therefore, the duties the Board owed to Murphy could not be expanded by the adoption of a particular standard of care by a handful of state employees.

 Murphy also argues that the rescue doctrine applies because Board officials testified they were concerned for Murphy's safety as well as the safety of others. Murphy therefore argues that when the Board undertook to "rescue" him from his alleged drug problem, the Board had a duty to do so in a reasonable manner. This argument might be more persuasive if Murphy's damages flowed from the disclosure

of his information to someone other than the prosecutor. But the fact that individual Board officials were concerned for Murphy's health and safety does not change the fact that the Board's duties include enforcing prescription drug laws and they must consult with local prosecuting attorneys, at some point, in order to do so.

Further, we find this theory particularly unpersuasive in light of Murphy's cause of action for negligent disclosure. Murphy does not explain how the disclosure itself was negligent, but instead hinges his arguments on his claim that the Board negligently omitted material facts and should have been better educated on the effect of prescription narcotics on certain patients. But Murphy has not pleaded a cause of action for negligent investigation or negligent misrepresentation. Instead, Murphy proceeded on a theory of negligent *disclosure*. Because such a theory contemplates the disclosure itself as the negligent act, we would have to hold that the Board, while having the right to inspect prescription information, has a duty in some instances to prevent that information from reaching the prosecuting attorney. No such duty is imposed by common law or by statute, and we will not create one in this case.

CONCLUSION

We hold that the pharmacy board had no duty to prevent disclosure of Murphy's prescription information to the Snohomish County prosecutor. Accordingly, we reverse and dismiss Murphy's claim without reaching the remaining issues raised by the State's appeal. In addition, our above conclusions dispose of all the issues raised by Murphy on

cross-appeal, and we therefore affirm the trial court on those issues.[10]

Cox, A.C.J., and GROSSE, J., concurs.

Review denied at 149 Wn.2d 1035 (2003).

---

[10] In particular, we note that we need not reach Murphy's argument with regard to his civil conspiracy claim because that claim relied upon the proposition that the Board's search of Murphy's prescription records was unlawful. As we have concluded above, the Board did not need a warrant to search Murphy's prescription records, so Murphy's civil conspiracy claim is no longer viable.