FILED
COURT OF APPEALS
DIVISION II

2013 NOV 19 AM 8: 39

STATE OF WASHINGTON

BY

DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

|  |  |
|---|---|
| SOUND SUPPORT, INC., A Washington Corporation, | No. 43678-7-II |
| Appellant, | |
| v. | |
| STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES and its subdivision, DIVISION OF DEVELOPMENTAL DISABILITIES, | UNPUBLISHED OPINION |
| Respondents. | |

MAXA, J. – Sound Support Inc. and its owners, James and Mary Anna Sibbett, appeal the trial court's summary judgment dismissal of their breach of contract and tort claims against the Washington State Department of Social and Health Services (DSHS) for terminating Sound Support's contract to provide services to DSHS's developmentally disabled clients. We hold that summary judgment dismissal of Sound Support and the Sibbetts' claims was proper because (1) reasonable minds could not disagree that DSHS had a reasonable basis for its belief that Sound Support failed to protect the health and safety of clients, which allowed DSHS to terminate the contract for default; (2) the facts did not support a cause of action for negligent investigation; (3) DSHS's refusal to consent to the assignment of Sound Support's contract did not constitute tortious interference with a business expectancy because it had no duty to consent; (4) the

Sibbetts could not recover for negligent infliction of emotional distress based on the termination of Sound Support's contract; and (5) the Sibbetts could not recover for intentional infliction of emotional distress because DSHS's conduct was not outrageous as a matter of law. Accordingly, we affirm the trial court's grant of summary judgment.

FACTS

DSHS contracts with private individuals and entities to provide community residential services and support to eligible persons with developmental disabilities. RCW 71A.10.015; RCW 71A.12.110; WAC 388-101-3010. Three DSHS divisions are involved in the process: the Division of Developmental Disabilities (DDD) enters into contracts with providers, monitors performance, and provides training and technical assistance; the Central Contract Services division administers the service contracts; and Residential Care Services certifies service providers, decertifies providers, and investigates allegations of abuse and neglect of clients.

*Sound Support Contract with DSHS*

In 2001, Sound Support contracted with DSHS to provide residential support services to DDD's clients. DSHS renewed this contract periodically for several years. The Sibbetts were the directors and shareholders of Sound Support. James Sibbett also was Sound Support's designated administrator.[1] General Term 26 of the Sound Support contract provided that DSHS could terminate the contract for "default" under certain circumstances:

> **Termination for Default.** The Contracts Administrator may immediately terminate this Contract for default, in whole or in part, by written notice to [Sound Support] if DSHS has a reasonable basis to believe that [Sound Support] has:
> a. Failed to meet or maintain any requirement for contracting with DSHS;

---

[1] The administrator is responsible for overseeing all aspects of staffing, developing, and maintaining policies and procedures for service and maintaining and securely storing client, personnel, and financial records. WAC 388-101-3190(2)(a), -3220.

2

b. Failed to protect the health or safety of any DSHS client pursuant to Additional Terms and Conditions, Section 3;[2]

c. Failed to perform under, or otherwise breached, any term or condition of this Contract; and/or

d. Violated any applicable law or regulation.

If it is later determined that [Sound Support] was not in default, the termination shall be considered a termination for convenience.

Clerk's Papers (CP) at 58. General Term 25 provided for termination for "convenience":

**Termination for Convenience.** DSHS may terminate this Contract in whole or in part when it is in the best interest of DSHS by giving [Sound Support] at least thirty (30) calendar days' written notice. [Sound Support] may terminate this Contract for convenience by giving DSHS at least thirty (30) calendar days' written notice.

CP at 57-58. The contract also provided that Sound Support "shall not assign this Contract . . . to a third party without the prior written consent of DSHS." CP at 53.

*Deficiencies and Termination of Contract*

According to DDD administrator Nancy Pesci, DDD began to notice a decline in the quality of services from Sound Support beginning in 2007, about the time that James Sibbett transitioned away from direct management of Sound Support. The problems escalated in 2008 and 2009. Pesci explained that Sound Support repeatedly failed to correct deficiencies in a timely manner to protect DDD clients' health and safety.

DDD identified various deficiencies in Sound Support's services over a several month period in late 2008 and 2009, including the following:

- In September 2008, Residential Care Services evaluators in reviewing a sample of medication records found that Sound Support "did not ensure medications were given as ordered and in a manner that safeguarded client health and safety." CP at 189.

---

[2] The third section of Additional Terms and Conditions states:
**Health and Safety.** [Sound Support] shall perform any and all of its obligations under this Contract in a manner that does not compromise the health and safety of any DSHS client with whom [Sound Support] has contact.
CP at 56.

3

- In November 2008, a client wrote a suicide note and gave it to Sound Support staff. Based on her supervisor's instruction, the staff member did not report it or take action other than to leave the client's door ajar. DDD became aware of the incident weeks later when the client repeated his suicidal thoughts to his therapist, who expressed concern with the lack of reporting and intervention.
- In January 2009, a client's guardian discovered that the client had not received immunizations that the guardian had requested over a year before and that no medical records were kept at his home. She also discovered a broken Plexiglas shard in the client's bedroom window and no privacy coverings on his bedroom windows, and that he was dressed in heavily stained and ill-fitting clothes.
- DDD became aware of a rodent infestation in a client's home on March 1, 2009. DDD sent a reminder e-mail to Sound Support on May 1 because the rodent infestation still had not been addressed.
- In April 2009, a DDD case manager refused to approve Sound Support medication procedures and psychoactive medications policies because they were not in compliance with DDD policies. In March and April 2009, three medication errors were reported by Sound Support staff. And in May 2009, Sound Support staff failed (twice in three days) to give a client medication for her urinary tract infection.
- DDD case managers noticed unrepaired ceiling water leakage and uncovered electrical outlets on June 29, 2009, during an annual assessment for a client. DDD informed Sound Support that the issues needed to be corrected immediately. But a month later, the repairs still had not begun.
- On July 17 and July 22, 2009, DDD staff visited the home of a client served by Sound Support. They found garbage strewn around the property and piled in the garage, including soiled adult briefs and used latex gloves, which had spilled out among the client's belongings. They also observed unapproved padlocks on the client's refrigerator, freezer, and food cabinets, which left the client without access to food except when provided by staff. DDD personnel instructed Sound Support to correct the conditions and reported them to Residential Care Services.

     DSHS's Residential Care Services investigator arrived two hours later and also observed six or seven unsecured bags of trash including used adult briefs, latex gloves, broken furniture, and discarded food, as well as trash on the roof, side of the house, and in the driveway. She also observed that the client's refrigerator, freezer, and cabinets were padlocked and no food was accessible to the client. The investigator concluded that Sound Support failed to maintain a safe and healthy environment for the client and used unapproved restrictive procedures.

     Four days later, Pesci and other DDD personnel conducted a follow up visit. The conditions remained except that Sound Support had removed the lock from the refrigerator. Pesci observed that the client was dirty, her hair unwashed, and she was wearing clothes in which she had been incontinent. She also witnessed the client use the bathroom without wiping because her toilet paper was restricted from her and kept secure.[3] Pesci also observed dangerous electrical wiring hanging down above the client's back porch.

---

[3] In late July 2009, the client's guardian chose to move her to a different provider.

- On July 24, 2009, DDD staff discovered a client living in an outside garage area in an unapproved restrictive setting resembling a cage.

Sound Support disputed or attempted to explain these reported deficiencies. James Sibbett acknowledged that Sound Support did not handle the suicide note incident appropriately, but he pointed out that the employees involved were disciplined for not following procedure. Sound Support also conceded the medication errors but argued that those errors should be compared to the records of other providers. Sound Support further argued that DSHS's evidence of a client's missing immunization records came from an untrustworthy source – the client's voluntary guardian, who is not a DSHS employee and is a co-owner of a competing provider.

Sound Support also challenged the gravity of the cleanliness and restrictive issues pertaining to another client. Sound Support pointed to a Residential Care Services report that found the client did not go without food and that the investigation did not reveal sufficient reason to believe James Sibbett or Todd Dubble (Sound Support's second in command) neglected the client.[4]

Sound Support denied that it had not dealt with the mice infestation in a timely fashion. Sound Support further disputed DSHS's evidence of the allegedly ignored water leakage, water damage, and uncovered outlets. Finally, Sound Support disagreed that a client was in a cage-like enclosure. James Sibbett contended that the client was not restricted by the fenced garage because it had an unlocked gate leading to the house.

DDD repeatedly discussed with Sound Support its concerns about the service deficiencies. According to DDD supervisor of case management services Lonnie Keesee, he

---

[4] On the other hand, the Residential Care Services report also noted that Sound Support received a citation for having used diapers, rubber gloves, and broken furniture in the client's garage and for not having an exception to the rules or physician's note for restricting her access to food.

attended or helped coordinate some 9 to 14 meetings between Sound Support staff and DDD personnel from March to July 2009. At one point James Sibbett wrote to DDD acknowledging its concerns and admitting that there were "cracks in services." CP at 482. Despite these issues, DSHS's contract with Sound Support was renewed automatically on July 2, 2009.

In early August, Pesci and other DDD personnel had a meeting with James Sibbett, in which they discussed DDD's escalating concerns. According to Pesci, James Sibbett decided to voluntarily terminate Sound Support's contract and discussed a plan for smoothly transferring all of Sound Support's clients to a different provider. According to James Sibbett, however, he did not agree to transfer clients to other providers or to terminate Sound Support's contract. On August 11, James Sibbett requested a few days to explore "alternate options." CP at 508.

One of the options James Sibbett considered was a sale of Sound Support assets and assignment of its client service contract with DSHS to another provider. On August 14, James Sibbett received a confidential term sheet from a certified provider, which contemplated an asset purchase and assignment of Sound Support's client service contract. The term sheet was non-binding and conditioned on "approval by the appropriate parties of the assignment of the Company's government contracts." CP at 479-80. DDD denied James Sibbett's request for consent to the assignment. The sale was not finalized.

On September 1, DDD requested that Central Contract Services terminate Sound Support's contract. Central Contract Services sent a letter terminating the contract for default effective September 2, 2009. The letter to Sound Support stated that DSHS had a reasonable good faith belief that Sound Support was unable to protect the health and safety of its clients.

*Lawsuit Against DSHS*

Sound Support and the Sibbetts sued DSHS. Sound South asserted claims for breach of contract, negligent investigation, and interference with a business expectancy. The Sibbetts personally asserted claims for negligent infliction of emotional distress and intentional infliction of emotional distress.

DSHS moved for summary judgment dismissal of all claims. In support of its motion, DSHS submitted declarations of DDD personnel – including Pesci, Keesee, and Beth Fee-Krehbiel – to document Sound Support's deficiencies set out above. The trial court granted Sound Support a 60-day CR 56(f) continuance to conduct additional discovery. Sound Support opposed the summary judgment motion with declarations and evidence explaining or challenging the reported deficiencies and providing mitigating circumstances. After a hearing, the trial court issued a letter opinion dismissing all claims.

Sound Support moved for reconsideration and to strike Fee-Krehbiel's declaration and portions of other declarations submitted by DSHS in support of summary judgment. The trial court issued a revised letter clarifying its ruling and denying Sound Support's motions. The trial court entered a final order granting summary judgment dismissal of all claims and denying Sound Support's motions. Sound Support appeals the summary judgment dismissal and the denial of its motion to strike.

ANALYSIS

A.  EVIDENTIARY RULINGS

Initially, Sound Support contends that the trial court erred in denying its motion to strike portions of the Fee-Krehbiel and Keesee declarations DSHS submitted in support of its summary judgment motion. These declarations described Sound Support's various deficiencies. Citing

CR 56(e), Sound Support argues that the declarations should have been stricken because of alleged discovery violations and because they were based on hearsay and unauthenticated photographs. We hold that the trial court did not err in denying the motion to strike and in considering the declarations.

Ordinarily, we review a trial court's evidentiary rulings for abuse of discretion, but we review such rulings made in conjunction with a summary judgment motion de novo. *Momah v. Bharti*, 144 Wn. App. 731, 749, 182 P.3d 455 (2008) (citing *Folsom v. Burger King*, 135 Wn.2d 658, 662-64, 958 P.2d 301 (1998) (holding that an appellate court reviews all evidence presented to the trial court, conducts the same inquiry, and reaches its own conclusion about admissibility of evidence)).

First, Sound Support argues that the trial court erred by denying its motion to strike the declarations because they relied on documents that DSHS did not specifically identify as foundational to the contract termination in a discovery letter dated September 28, 2011. DSHS asserts, and Sound Support does not state otherwise, that DSHS eventually produced these documents in discovery. Further, Sound Support received the declarations on January 13, 2012, and was granted a 60-day continuance under CR 56(f) to allow time for additional discovery. The summary judgment hearing did not occur until after this discovery period, on April 27. As a result, for more than three months before the summary judgment hearing, Sound Support was aware of these DSHS declarations and the documents DSHS relied on. Therefore, Sound Support was not disadvantaged by DSHS's failure to identify the documents as foundational to the termination during discovery. Accordingly, we hold that the trial court did not err in denying Sound Support's motion to strike the declarations for alleged discovery violations.

Second, Sound Support argues that DSHS's summary judgment declarations were based on hearsay statements of a DDD employee and unauthenticated photographs taken by the same DDD employee, who did not submit a declaration. Generally, hearsay is inadmissible and cannot be considered by a court ruling on a summary judgment motion. CR 56(e); ER 802; *Warner v. Regent Assisted Living*, 132 Wn. App. 126, 135-36, 130 P.3d 865 (2006). But a statement is not hearsay unless it is admitted for the truth of the matter asserted. ER 801(c). Here, DSHS offered the two challenged declarations to show that the information DDD obtained provided a *reasonable basis for a belief* that Sound Support failed to protect the health and safety of *any* client, not for the truth of that information. Accordingly, the trial court did not err in considering the declarations in evaluating the summary judgment motion.

B.      SUMMARY JUDGMENT

Sound Support and the Sibbetts challenge the trial court's grant of summary judgment dismissal on the breach of contract claim and the various tort claims. We hold that summary judgment was appropriate on all claims.

1.      Standard of Review

We review a trial court's order granting summary judgment de novo. *Loeffelholz v. Univ. of Wash.*, 175 Wn.2d 264, 271, 285 P.3d 854 (2012). Summary judgment is appropriate where, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Loeffelholz*, 175 Wn.2d at 271. "A genuine issue of material fact exists where reasonable minds could differ on the facts controlling the outcome of the litigation." *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). If reasonable minds can reach only one

9

conclusion on an issue of fact, that issue may be determined on summary judgment. *M.A. Mortenson Co. v. Timberline Software Corp.*, 140 Wn.2d 568, 579, 998 P.2d 305 (2000).

2.  Breach of Contract Claim

Sound Support argues that DSHS's termination constituted a breach of contract because DSHS had no reasonable basis to believe that Sound Support was in default and that summary judgment was inappropriate because questions of fact existed regarding DSHS's reasonable belief. DSHS argues that summary judgment was proper because reasonable minds could reach only one conclusion – that it did have a reasonable basis for believing Sound Support was in default. In the alternative, DSHS argues that even if there was no basis for termination for default, the contract was properly terminated for convenience. We agree with DSHS that its belief that Sound Support was in default was reasonable as a matter of law.

DSHS terminated the Sound Support contract on the grounds that it had a reasonable basis to believe that Sound Support had failed to protect the health and safety of DSHS clients, as allowed in General Term 26(b). Reasonableness typically is a question of fact. *See Guijosa v. Wal-Mart Stores, Inc.*, 101 Wn. App. 777, 793, 6 P.3d 583 (2000) (whether shopkeeper had reasonable grounds to detain shoplifter is a question of fact), *aff'd on other grounds*, 144 Wn.2d 907, 32 P.3d 250 (2001). However, if reasonable minds can reach only one conclusion on an issue, it can be determined on summary judgment. *M.A. Mortenson*, 140 Wn.2d at 579.

The evidence established that DSHS's belief was based DDD personnel's numerous eyewitness accounts of repeated, unresolved health and safety issues for various Sound Support clients. For example, DDD identified the following deficiencies: failure to ensure that medication was given as ordered, failure to report or take intervening action in response to a client suicide note, failure to provide requested immunizations, unaddressed rodent infestation,

medication errors, unrepaired water leakage, uncovered electrical outlets, unsanitary conditions and unapproved restrictive measures.

Sound Support challenged the probative value of DSHS's evidence and offered mitigating circumstances for many deficiencies cited by DDD. Sound Support also contended that Residential Care Services's investigations did not reveal any significant problems. And Sound Support pointed out that DSHS renewed its contract after the alleged deficiencies were reported and discussed. Sound Support argues that this evidence created questions of fact and precluded summary judgment. However, DSHS submitted undisputed evidence of at least some health and safety issues, and Sound Support concedes that its services were deficient in some respects.

The contract expressly authorized termination if DSHS had a reasonable basis for believing that Sound Support had failed to protect the health and safety of *any* DSHS client. More significantly, under the contract language, the question is not whether Sound Support *actually* failed to protect the health and safety of DSHS's clients, but whether the information DDD obtained provided a *reasonable basis for DSHS to believe* that Sound Support failed in these duties. DSHS submitted substantial evidence of Sound Support's deficiencies and problems, some of which Sound Support admitted. As a matter of law, this evidence provided a reasonable basis for DSHS's belief that Sound Support had failed to protect the health and safety of not just one, but multiple clients.

Sound Support seems to argue that considering the totality of the circumstances, DSHS *should not* have terminated the contract. However, whether it was "reasonable" for DSHS to terminate the contact or whether another entity would have acted differently under these facts is

immaterial. The issue is whether DSHS had a right under the contract terms to terminate. The evidence clearly establishes that contractual right.

Viewing the evidence in the light most favorable to Sound Support, we hold that reasonable minds could reach only one conclusion – that DSHS had a reasonable basis to believe that Sound Support failed to protect the health and safety of "any client." Because DSHS had this reasonable belief, DSHS's exercise of the termination for default clause was not a breach of contract. Accordingly, we hold that the trial court did not err in granting summary judgment dismissal of Sound Support's breach of contract claim.[5]

### 3. Tort Claims

Sound Support and the Sibbetts also contend that the trial court erred in granting summary judgment on various tort claims: negligent investigation, interference with a business expectancy, negligent infliction of emotional distress, and intentional infliction of emotional distress. We disagree.

### a. Negligent Investigation

Sound Support contends that DDD proceeded against the authority of DSHS's directives in conducting its own investigation despite findings favorable to Sound Support from Residential Care Services and that DDD performed this investigation negligently because it ignored mitigating factors considered by Residential Care Services. But Sound Support fails to cite

---

[5]DSHS argues in the alternative that even if termination for default was not proper, the termination was permitted without "cause" under the contract's termination for convenience term. Because we hold that termination for default was appropriate, we need not address this issue. We also need not address Sound Support's responsive arguments that termination for convenience would breach the implied covenant of good faith and fair dealing, that the termination for convenience clause created an illusory contract, and that termination for convenience would allow Sound Support to recover resulting lost profits and windup costs.

12

authority to support a cause of action for negligent investigation under the circumstances presented or to identify a statute creating a duty to investigate from which we could recognize an implied cause of action. "State agencies are creatures of statute, and their legal duties are determined by the legislature." *Murphy v. State*, 115 Wn. App. 297, 317, 62 P.3d 533 (2003). Under certain circumstances, a legislative enactment may be the foundation of a right of action. *Tyner v. Dep't of Soc. & Health Servs.*, 141 Wn.2d 68, 77-78, 1 P.3d 1148 (2000); *see M.W. v. Dep't of Soc. & Health Servs.*, 149 Wn.2d 589, 596, 70 P.3d 954 (2003) (recognizing that when the legislature creates a duty, courts may provide a remedy for its breach).

Generally, claims for negligent investigation against state agencies do not exist under Washington common law because of the potential chilling effect such claims would have on investigations. *Ducote v. Dep't of Soc. & Health Servs.*, 167 Wn.2d 697, 702, 222 P.3d 785 (2009); *Janaszak v. State*, 173 Wn. App. 703, 725, 297 P.3d 723 (2013). Courts have recognized a cause of action for negligent investigation of child abuse allegations under chapter 26.44 RCW. *Roberson v. Perez*, 156 Wn.2d 33, 44-47, 123 P.3d 844 (2005); *M.W.*, 149 Wn.2d at 595; *Tyner*, 141 Wn.2d 77-78, 82. However, that cause of action is limited to claims by parents, guardians, and children against DSHS for conducting biased or faulty investigations that lead to harmful placement decisions. *Roberson*, 156 Wn.2d at 44-47; *M.W.*, 149 Wn.2d at 602. No Washington case has held that an agency investigating a service provider owes a duty to that provider to conduct a reasonable investigation. And certainly no case has held that an agency has a duty not to investigate potential health and safety issues for disabled clients.

We hold that Sound Support did not state a claim for negligent investigation and, therefore, that summary judgment on this issue was proper.

      b.    Tortious Interference with Business Expectancy

Sound Support contends that DSHS is liable for interfering with a business expectancy because DSHS refused to consent to assignment of Sound Support's DSHS contract to a third-party provider. DSHS argues that it had no obligation under the contract to consent to the assignment, and therefore any such alleged "interference" was not improper and cannot give rise to a tortious interference claim. We agree with DSHS.

A plaintiff claiming tortious interference with a business expectancy must prove

(1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage.

*Leingang v. Pierce County Med. Bureau, Inc.,* 131 Wn.2d 133, 157, 930 P.2d 288 (1997). However, exercising one's legal interests in good faith is not improper interference with a business expectancy. *Leingang,* 131 Wn.2d at 157.

In *Tacoma Auto Mall, Inc. v. Nissan N. Am., Inc.,* a manufacturer was sued for tortious interference for withholding its consent to the sale of a dealership. 169 Wn. App. 111, 116-17, 132-34, 279 P.3d 487, *review denied,* 175 Wn.2d 1024 (2012). We held that the claim failed as a matter of law because the manufacturer/dealer contract provided that any transfer of the automobile dealership was subject to approval from the manufacturer and because the asset purchase agreement also acknowledged the approval contingency. *Tacoma Auto Mall,* 169 Wn. App. at 134. Similarly, in *Johnson v. Yousoofian,* a lessee sued a lessor for tortious interference for refusing to consent to assignment of the lease. 84 Wn. App. 755, 757-59, 930 P.2d 921 (1996). The lease provided that the "[l]essee shall not . . . assign this lease . . . without the written consent of the [l]essor." *Johnson,* 84 Wn. App. 757 (second alteration in original). Division One of this court held that the lease did not impose an obligation on the lessor to

14

consent to assignment and that the lease gave the lessor an absolute privilege to refuse consent to an assignment. *Johnson*, 84 Wn. App. at 762-63.

As in *Johnson*, the contract here expressly prohibited the assignment of the contract without DSHS's consent, and it imposed no explicit standard of conduct. Moreover, the agreement contemplating the third-party provider's purchase of Sound Support's assets expressly acknowledged that the asset purchase agreement was conditioned on DSHS's approval of assignment of Sound Support's DSHS contract. Nothing in the terms of the contract obligated DSHS to consent to the assignment.

Sound Support argues that DSHS's "nonapproval" of the assignment/sale was an improper *ultra vires* act because DSHS failed to follow administrative guidelines for evaluating applications to sell provider entities. But the rules governing DSHS's evaluation of a provider's application for change in ownership do not control here because Sound Support did not apply for a change in ownership. *See* WAC 388-101-3060, - 3090. Rather, Sound Support requested DSHS's consent to assign its (Sound Support's) provider contract to a third party in conjunction with an asset purchase agreement.

DSHS's exercise of its right under the contract to refuse to consent to assignment of Sound Support's provider contract was not improper. *See Tacoma Auto Mall*, 169 Wn. App. at 132-34; *Johnson*, 84 Wn. App. at 762-63. Accordingly, we hold that summary judgment was appropriate on the tortious interference with a business expectancy claim.

      c.    Negligent Infliction of Emotional Distress

The Sibbetts assert that the trial court erred by granting summary judgment dismissal of their claims against DSHS for negligent infliction of emotional distress. We hold that the

Sibbetts cannot recover for emotional distress caused by DSHS's alleged breach of Sound Support's contract.[6]

In the absence of physical injury, claims for emotional distress are permitted in negligence cases only where the emotional distress is "(1) within the scope of foreseeable harm of the negligent conduct, (2) a reasonable reaction given the circumstances, and (3) manifest[ed] by objective symptomatology." *Bylsma v. Burger King Corp.*, 176 Wn.2d 555, 560, 293 P.3d 1168 (2013). As with any tort, the threshold question for negligent infliction of emotional distress is whether the defendant owes a duty to the plaintiff. *Strong v. Terrell*, 147 Wn. App. 376, 387, 195 P.3d 977 (2008).

Here, the Sibbetts contend that they suffered emotional distress as a result of "the termination of [their] business" and the "abrupt termination of [their] service contract." Br. of Appellant at 23. But DSHS terminated *Sound Support's* contract, not a contract with the Sibbetts. Although the Sibbetts owned Sound Support, they were not parties to the DSHS contract with Sound Support. The Sibbetts fail to show that DSHS owed them a duty personally to refrain from lawfully terminating the contract of a corporation they owned. And the Sibbetts do not claim that DSHS engaged in any other allegedly wrongful conduct to support their negligent infliction of emotional distress claim. Accordingly, we hold that DSHS owed no tort duty to the Sibbetts personally with regard to termination of the Sound Support contract and, therefore, summary judgment dismissal of their negligent infliction of emotional distress claim was proper.

---

[6] The Sibbetts' attempt to recover in tort for DSHS's alleged breach of contract with Sound Support potentially implicates the independent duty doctrine. *See, e.g., Eastwood v. Horse Harbor Found, Inc.*, 170 Wn.2d 380, 389, 241 P.3d 1256 (2010). However, because DSHS did not raise this issue, we need not analyze whether the doctrine bars the Sibbetts' negligent infliction of emotional distress claims.

d. Intentional Infliction of Emotional Distress

The Sibbetts argue that the trial court erred by granting summary judgment dismissal of their claim against DSHS for intentional infliction of emotional distress. We hold that summary judgment dismissal of this claim was proper because DSHS's conduct was not outrageous as a matter of law.

To prevail on a claim for the tort of intentional infliction of emotional distress, also known as outrage, a plaintiff must prove that (1) the defendant engaged in extreme and outrageous conduct, (2) the defendant intentionally or recklessly inflicted emotional distress on the plaintiff, and (3) the conduct actually resulted in severe emotional distress to the plaintiff. *Strong*, 147 Wn. App. at 385. "Although these elements are generally factual questions for the jury, a trial court faced with a summary judgment motion must first determine whether reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability." *Strong*, 147 Wn. App. at 385. "Any claim of outrage must be predicated on behavior 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Strong*, 147 Wn. App. at 385-86 (internal quotation marks omitted) (quoting *Kloepfel v. Bokor*, 149 Wn.2d 192, 196, 66 P.3d 630 (2003)).

Here, the record does not support the Sibbetts' assertion that a reasonable jury could find DSHS's actions outrageous. The alleged outrageous conduct was DSHS's decision to terminate Sound Support's contract without giving Sound Support meaningful notice or opportunity to cure, DSHS's transfer of clients from Sound Support to other providers, DSHS's alleged reneging on a promise to slow down the transfer of those clients, a flippant comment from a DSHS employee that " 'the horse is out of the barn on this one, buddy,' " and DSHS's refusal to

consent to assignment of Sound Support's contract to another provider. Br. of Appellant at 25-26. Viewing the evidence in the light most favorable to the Sibbetts, we conclude that no reasonable person could conclude that DSHS's conduct was " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Strong*, 147 Wn. App. at 385 (internal quotation marks omitted) (quoting *Kloepfel*, 149 Wn.2d at 196). Accordingly, we hold that the Sibbetts' claims for intentional infliction of emotional distress fail as a matter of law and that summary judgment dismissal of these claims also was proper.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record pursuant to RCW 2.06.040, it is so ordered.

MAXA, J.

We concur:

HUNT, J.

WORSWICK, C.J.

18