[No. 41356-6-II.    Division Two.    June 26, 2012.]

TACOMA AUTO MALL, INC., *Petitioner*, v. NISSAN NORTH AMERICA, INC., *Respondent*.

112

114

*James A. Krueger, Lucy R. Clifthorne,* and *Daniel C. Montopoli* (of *Vandeberg Johnson & Gandara LLP*), for petitioner.

*James E. Howard* and *Samantha E. Funk* (of *Dorsey & Whitney LLP*), for respondent.

¶1 Van Deren, J. — Tacoma Auto Mall Inc. (TAM) appeals the trial court's summary judgment order finding that it does not have standing to assert a claim against Nissan North America Inc. (NNA) for violation of the Washington manufacturers' and dealers' franchise agreements act (Franchise Act), chapter 46.96 RCW. TAM also appeals the trial court's dismissal on summary judgment of its claims against NNA alleging promissory estoppel, breach of a unilateral contract, and violation of a third-party beneficiary's rights in its attempted purchase of a Puyallup Nissan dealership. NNA cross appeals the trial court's (1) failure to grant summary judgment on TAM's claims of tortious interference and lost profit damages and (2) rejection of NNA's contention that the state Franchise Act precluded all of the purchaser's common law claims based on promissory estoppel, third-party beneficiary status, implied contract, tortious interference, and damages. We affirm the trial court's order granting summary judgment dismissal of TAM's claims of promissory estoppel, third-party beneficiary contract, unilateral implied contract, and violation of the Franchise Act. We reverse the trial court's denial of summary judgment on TAM's claims of tortious interference and lost profit damages and remand for dismissal of TAM's suit.

## FACTS

¶2 TAM, formerly Tacoma Dodge Inc., was formed in 1972 and operated for many years as a Dodge automobile dealership under a franchise agreement with Chrysler Motors Inc. In June 2009, the dealership changed its name to Tacoma Auto Mall following Chrysler Motors' bankruptcy and termination of the Dodge franchise.

¶3 When TAM discovered that Puyallup Nissan was for sale, TAM's owner entered into an agreement with Puyallup Nissan's owner to purchase Puyallup Nissan's assets. Under the terms of the franchise agreement between

Puyallup Nissan and NNA, NNA had to consent to the sale of the franchise to TAM.

¶4 NNA refused to consent to TAM as a Nissan franchisee and, therefore, refused to consent to the sale by Puyallup Nissan. TAM sued NNA, asserting that NNA unreasonably withheld consent to the sale by Puyallup Nissan. It alleged that NNA's actions violated the Franchise Act, specifically former RCW 46.96.200 (1994). It also alleged that NNA's actions constituted tortious interference with the contractual relationship between TAM and Puyallup Nissan, that NNA should be promissorily estopped from refusing consent, that TAM is a third-party beneficiary of the contract between NNA and Puyallup Nissan, that NNA breached an implied contract with TAM by refusing consent, and that TAM is entitled to specific performance of that implied contract.

¶5 The trial court granted NNA's summary judgment motion on TAM's claims of promissory estoppel, third-party beneficiary contract, unilateral implied contract, and violation of the Franchise Act. The trial court denied NNA's motion on TAM's claims of tortious interference and damages for lost profits, and it rejected NNA's argument that the Franchise Act preempts TAM's common law tort claims. The trial court also certified that the order involved a controlling question of law as to which there is substantial ground for a difference of opinion and that immediate review of the order by the Court of Appeals may materially advance the ultimate termination of the litigation. Both parties successfully sought discretionary review of the trial court's orders.

## ANALYSIS

### I. STANDARD OF REVIEW

¶6 In reviewing a summary judgment order, we engage in the same inquiry as the trial court. *King County Fire Prot. Dist. No. 16 v. Hous. Auth.*, 123 Wn.2d 819, 825, 872

P.2d 516 (1994). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 516, 799 P.2d 250 (1990) (quoting CR 56(c)). "A material fact is one upon which the outcome of the litigation depends in whole or in part." *Atherton*, 115 Wn.2d at 516. We consider the evidence in the light most favorable to the nonmoving party. *Gerken v. Mut. of Enumclaw Ins. Co.*, 74 Wn. App. 220, 224-25, 872 P.2d 1108 (1994).

¶7 A defendant in a civil action is entitled to summary judgment if he can show that there is an absence or insufficiency of evidence supporting an element that is essential to the plaintiff's claim. *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). " 'In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.' " *Young*, 112 Wn.2d at 225 (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). The plaintiff may not rely on the allegations in the pleadings but must set forth specific facts showing that a genuine issue exists. *Young*, 112 Wn.2d at 225.

II. STANDING

¶8 TAM first asserts that the trial court erred in dismissing its claim that NNA violated former RCW 46.96.200. We first determine whether TAM has standing to assert a violation of the Franchise Act under these circumstances.

¶9 Washington courts apply a two-part test to determine whether a party has standing. *Nelson v. Appleway Chevrolet, Inc.*, 160 Wn.2d 173, 186, 157 P.3d 847 (2007);

*Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake,*
150 Wn.2d 791, 802, 83 P.3d 419 (2004). First, we ask
whether the interest asserted is within the zone of interests
the statute in question protects. *Nelson,* 160 Wn.2d at 186;
*Grant County,* 150 Wn.2d at 802. Second, we consider
whether the party seeking standing has suffered an injury
in fact. *Nelson,* 160 Wn.2d at 186; *Grant County,* 150 Wn.2d
at 802. "Both tests must be met by the party seeking
standing." *Branson v. Port of Seattle,* 152 Wn.2d 862,
875-76, 101 P.3d 67 (2004); *High Tide Seafoods v. State,* 106
Wn.2d 695, 702, 725 P.2d 411 (1986) (noting that even if the
plaintiffs could show adequate injury, they would fail the
zone of interest test).

■ ¶10  When evaluating whether a party's interests are
within the zone of interests a statute protects, we look to
the statute's general purpose. *Branson,* 152 Wn.2d at 876
n.7. If the statute in question was not designed to protect a
party's interests, it is not within the zone of interest and its
assertion of standing fails. *Grant County,* 150 Wn.2d at 803.

■ ¶11  The legislature set forth the purpose of the
Franchise Act as follows:

> The legislature finds and declares that the distribution and
> sale of motor vehicles in this state vitally affect the general
> economy of the state and the public interest and public welfare,
> that provision for warranty service to motor vehicles is of
> substantial concern to the people of this state, that the main-
> tenance of fair competition among dealers and others is in the
> public interest, and that the maintenance of strong and sound
> dealerships is essential to provide continuing and necessary
> reliable services to the consuming public in this state and to
> provide stable employment to the citizens of this state. The
> legislature further finds that there is a substantial disparity in
> bargaining power between automobile manufacturers and *their
> dealers,* and that in order to promote the public interest and the
> public welfare, and in the exercise of its police power, it is
> necessary to regulate the relationship between motor vehicle
> dealers and motor vehicle manufacturers, importers, distribu-
> tors, and their representatives doing business in this state, not

only for the protection of dealers but also for the benefit for the public in assuring the continued availability and servicing of automobiles sold to the public.

The legislature recognizes it is in the best interest for *manufacturers and dealers* of motor vehicles to conduct business with each other in a fair, efficient, and competitive manner. The legislature declares the public interest is best served *by dealers* being assured of the ability to manage *their* business enterprises under a contractual obligation with manufacturers where *dealers* do not experience unreasonable interference and *are assured of the ability to transfer ownership of their business without undue constraints*. It is the intent of the legislature to impose a regulatory scheme and to regulate competition in the motor vehicle industry to the extent necessary to balance fairness and efficiency. These actions will permit motor vehicle *dealers* to better serve consumers and allow dealers to devote their best competitive efforts and resources to the sale and services of the manufacturer's products to consumers.

RCW 46.96.010 (emphasis added). The express purpose of the Franchise Act is to regulate the relationship between manufacturers and "their dealers" in order to protect those dealers and benefit the car-buying public. RCW 46.96.010.

¶12 Moreover, the specific provision of the Franchise Act that TAM asserts NNA violated, former RCW 46.96-.200, expressly provided for *administrative review* of the "reasonabl[eness]" of the manufacturer's refusal to consent to the dealer's proposed sale of the dealership and the standard to be applied at such hearing. But former RCW 46.96.200 expressly limited participation in the administrative hearing to the manufacturer and the selling dealer. Former RCW 46.96.200 provided in relevant part:

(1) Notwithstanding the terms of a franchise, *a manufacturer shall not unreasonably withhold consent to the sale*, transfer, or exchange of a franchise to a qualified buyer who meets the normal, reasonable, and uniformly applied standards established by the manufacturer for the appointment of a new dealer or is capable of being licensed as a new motor vehicle dealer in

the state of Washington. A decision or determination made by the administrative law judge as to whether a qualified buyer is capable of being licensed as a new motor vehicle dealer in the state of Washington is not conclusive or determinative of any ultimate determination made by the department of licensing as to the buyer's qualification for a motor vehicle dealer license. A manufacturer's failure to respond in writing to a request for consent under this subsection within sixty days after receipt of a written request on the forms, if any, generally used by the manufacturer containing the information and reasonable promises required by a manufacturer is deemed to be consent to the request. A manufacturer may request, and, if so requested, the applicant for a franchise (a) shall promptly provide such personal and financial information as is reasonably necessary to determine whether the sale, transfer, or exchange should be approved, and (b) shall agree to be bound by all reasonable terms and conditions of the franchise.

(2) If a manufacturer refuses to approve the sale, transfer, or exchange of a franchise, the manufacturer shall serve written notice on the applicant, the transferring, selling, or exchanging new motor vehicle dealer, and the department of its refusal to approve the transfer of the franchise no later than sixty days after the date the manufacturer receives the written request from the new motor vehicle dealer. If the manufacturer has requested personal or financial information from the applicant under subsection (1) of this section, the notice shall be served not later than sixty days after the receipt of all of such documents. Service of all notices under this section shall be made by personal service or by certified mail, return receipt requested.

(3) The notice in subsection (2) of this section shall state the specific grounds for the refusal to approve the sale, transfer, or exchange of the franchise.

(4) *Within twenty days after receipt of the notice of refusal* to approve the sale, transfer, or exchange of the franchise by the transferring new motor vehicle dealer, *the new motor vehicle dealer may file a petition with the department to protest the refusal to approve the sale,* transfer, or exchange. The petition shall contain a short statement setting forth the reasons for the dealer's protest. Upon the filing of a protest and the receipt of

the filing fee, the department shall promptly notify the manufacturer that a timely protest has been filed, and *the department shall arrange for a hearing with an administrative law judge* as the presiding officer *to determine if the manufacturer unreasonably withheld consent to the sale*, transfer, or exchange of the franchise.

(5) In determining whether the manufacturer unreasonably withheld its approval to the sale, transfer, or exchange, *the manufacturer has the burden of proof that it acted reasonably.* A manufacturer's refusal to accept or approve a proposed buyer who otherwise meets the normal, reasonable, and uniformly applied standards established by the manufacturer for the appointment of a new dealer, or who otherwise is capable of being licensed as a new motor vehicle dealer in the state of Washington, is presumed to be unreasonable.

(6) The administrative law judge shall conduct a hearing and render a final decision as expeditiously as possible, but in any event not later than one hundred twenty days after a protest is filed. *Only the selling,* transferring, or exchanging new motor vehicle *dealer and the manufacturer may be parties to the hearing.*

(7) The administrative law judge shall conduct any hearing as provided in RCW 46.96.050(2), and all hearing costs shall be borne as provided in that subsection. *Only the manufacturer and the selling,* transferring, or exchanging new motor vehicle *dealer may appeal the final order of the administrative law judge* as provided in RCW 46.96.050(3).

(Emphasis added.)

■ ¶13 Here, the express purpose and clear import of these statutes is to protect the selling dealer. Any benefit to the prospective purchaser is merely incidental and remains so even if the statutes' administrative review procedures are triggered by a timely protest from the selling dealer, which did not occur here; i.e., Puyallup Nissan did not seek to invoke the administrative review of NNA's refusal to consent to TAM's purchase of Puyallup Nissan.

¶14 Because the purpose and design of the Franchise Act is to protect selling dealers rather than prospective pur-

chasers, TAM is not in the zone of interest and does not meet this requirement for standing under the act. *See Branson*, 152 Wn.2d at 876 n.7; *Grant County*, 150 Wn.2d at 803 (a party's assertion of standing fails if the statute at issue is not designed to protect the interests of the party asserting standing). Accordingly, TAM cannot assert a claim alleging a violation of former RCW 46.96.200 under the Franchise Act and the trial court did not err in dismissing TAM's claim alleging violation of that statute.

¶15 TAM relies heavily on a California appellate decision, *Don Rose Oil Co. v. Lindsley*, 160 Cal. App. 3d 752, 206 Cal. Rptr. 670 (1984), in arguing that it has standing to assert a claim under former RCW 46.96.200. But a subsequent California appellate decision shows that TAM's reliance on *Don Rose Oil* is misplaced. In *Dameshghi v. Texaco Refining & Marketing, Inc.*, the California appellate court observed the limits of the *Don Rose Oil* decision as follows:

> Evidently, the Legislature intended to grant standing to sue for violations of the Franchise Investment Law to franchisees or subfranchisors, neither of which fairly describes Dameshghi. Citing *Don Rose Oil*[,] . . . 160 Cal.App.3d [at] 759, Dameshghi argues that he should not be denied access to the courts to enforce his claim that the alleged misrepresentations were made.[13] Since it is clear as a matter of law that Dameshghi never became a "franchisee" within the meaning of Corporation Code section 31006, and since the Legislature declined to define a franchisee as including a "prospective" franchisee, we believe Dameshghi's argument is not well taken that he must be entitled to access to the courts to redress allegedly misleading "offerings" of a franchise. Moreover, we do not believe that Texaco's acts in submitting the one-year trial lease documents to Dameshghi for his consideration should constitute an estoppel against any statutory argument it might make regarding standing under the Franchise Investment Law.

---

[13] In *Don Rose Oil*[,] . . . 160 Cal.App.3d [at] 759, the court held a *prospective assignee of a contract* was entitled to standing to enforce the contract provision regarding assignment,

which was conditioned upon consent by a petroleum franchisor. Noting that the trend in the law is toward the assignability of contract rights, the court found it was unreasonable and outrageous for the franchisor to contend that because of the conditional nature of the assignment, the prospective assignee could not sue it without its consent. *However convincing such a viewpoint may be where common law contract issues are concerned, where specific statutes have been enacted granting a private right of action and defining those who are entitled to enforce such a right* (e.g., Corp. Code, §§ 31300, 31006), *we believe the statutory language must control.*

*Dameshghi v. Texaco Refining & Marketing, Inc.*, 3 Cal. App. 4th 1262, 1284-85, 6 Cal. Rptr. 2d 515 (1992) (emphasis added), *disapproved in part on other grounds in Trope v. Katz*, 11 Cal. 4th 274, 287, 902 P.2d 259, 45 Cal. Rptr. 2d 241 (1995). Thus, we hold that the trial court did not err in dismissing TAM's claims based on NAA's alleged violation of former RCW 46.96.200.

III.   FRANCHISE ACT AS EXCLUSIVE REMEDY

██ ¶16 NNA alternatively argues that the Franchise Act provides a comprehensive regulatory scheme that precludes TAM's common law claims. Initially, we note that by agreeing with NAA's argument that TAM lacks standing to assert claims under the Franchise Act, it follows that the act cannot be the exclusive remedy for TAM's allegations that NAA wrongfully withheld approval of its purchase of Puyallup Nissan. Although TAM has no standing (as discussed above) to assert a claim that NNA violated the Franchise Act and although TAM cannot bring a common law claim grounded on a Franchise Act violation,[1] TAM is not barred from asserting other common law claims provided the proper circumstances are present.

---

[1] As a New Jersey appellate court held when reviewing a similar franchise act provision, "[I]t can hardly be suggested that statutory rights adopted for the benefit of a franchisee can be the basis for a common-law suit on behalf of someone not protected by the [New Jersey Franchise Practices] Act." *Tynan v. Gen. Motors Corp.*, 248 N.J. Super. 654, 671, 591 A.2d 1024 (1991), *rev'd in part on other grounds*, 127 N.J. 269, 604 A.2d 99 (1992).

¶17 *Potter v. Washington State Patrol*, 165 Wn.2d 67, 196 P.3d 691 (2008) is instructive about the appropriate analysis for determining whether a statutory scheme provides the exclusive remedy for an aggrieved party seeking relief for harms alleged. "If a remedy provided by a statute is exclusive, the statute implicitly abrogates all common law remedies within the scope of the statute." *Potter*, 165 Wn.2d at 79.

¶18 First, we consider whether the statute contains an exclusivity clause and, if not, whether other language indicates that the legislature intended the statutory remedy to be exclusive. *Potter*, 165 Wn.2d at 80-81. Here, the statute in question, former RCW 46.96.200, contains no explicit statement of exclusivity. Also, as we discussed earlier, the legislative purpose in RCW 46.96.010 indicates that the Franchise Act is intended to regulate the relationship between manufacturers and "their dealers" in order to protect those dealers and benefit the car-buying public, not to regulate the business transaction between the potential purchaser and the selling dealer. Although former RCW 46.96.200 provided selling dealers with an expedited administrative review process for challenging a manufacturer's withholding of consent to a dealership sale, nothing in the language and structure of these statutes suggests that in providing an expedited administrative proceeding for the benefit of selling dealers, the legislature intended to foreclose all other avenues of redress. "[T]he fact the legislature provided a statutory remedy does not necessarily evidence a clear intent to create an *exclusive* remedy." *Potter*, 165 Wn.2d at 85.

¶19 Finding no language in the statutes clearly establishing the exclusivity of the remedy provided in former RCW 46.96.200, we next look to " 'other manifestations' " such as the purpose of the statute, comprehensiveness of the statutory remedy, and the origin of the statutory right. *Potter*, 165 Wn.2d at 84 (quoting *Wilmot v. Kaiser Aluminum & Chem. Corp.*, 118 Wn.2d 46, 54, 821 P.2d 18 (1991)). None of these factors suggest exclusivity.

¶20 As we discussed above, the Franchise Act's clear purpose, as stated in RCW 46.96.010, is to redress the "substantial disparity in bargaining power between automobile manufacturers and their dealers," to ensure such dealers the ability to transfer ownership of their business without undue constraints and, thus, to impose a regulatory scheme "to the extent necessary" to balance fairness and efficiency. RCW 46.96.010. The stated purpose is limited and clearly focuses on protecting manufacturers' franchisee dealers. The protection of such dealers was enhanced by former RCW 46.96.200's expedited administrative proceeding, at which a manufacturer's selling dealer could challenge the manufacturer's withholding of consent to the dealer's proposed sale. But the stated purpose of protecting selling dealers would be thwarted if the administrative proceeding in former RCW 46.96.200 was exclusive, thereby depriving the selling dealer of other claims or avenues of redress against the manufacturer. Thus, the stated purpose of the Franchise Act was accomplished only if former RCW 46.96.200's expedited administrative proceeding is viewed as an additional protection to selling dealers rather than as an exclusive remedy.

¶21 Nor is former RCW 46.96.200's remedy comprehensive. The statute provided that only the selling dealer could invoke the administrative protest proceeding and that only the selling dealer and the manufacturer may be parties to the ensuing administrative hearing. Former RCW 46-.96.200(4), (6). The statute did not mention the potential purchaser. Thus, if former RCW 46.96.200's expedited administrative proceeding was considered the exclusive remedy available, it would foreclose any avenue of redress for a potential purchaser who might have a valid common law claim against the manufacturer under appropriate circumstances. Thus, the scope, reach, and practical effect of former RCW 46.96.200 suggest that the statute's administrative remedy was not exclusive.

¶22 Finally, as to origin of the statutory right, we consider "whether the statute creates a new right or whether

the right preexisted the statute at common law. Where the common law remedy predates the statutory remedy, the court infers the statutory remedy is cumulative, not exclusive." *Potter*, 165 Wn.2d at 88 (citation omitted). The Franchise Act was enacted in 1989. *See* LAWS OF 1989, ch. 415, § 1. TAM's common law claims (tortious interference, promissory estoppel, third-party beneficiary breach of contract) all clearly predate the Franchise Act, which suggests that former RCW 46.96.200's administrative remedy was not exclusive. In sum, applying the *Potter* analysis, we reject NNA's alternative contention that the Franchise Act provides an exclusive remedy that precludes all of TAM's common law claims.

¶23 We now turn to TAM's other, nonstatutory claims asserted against NNA.

IV. PROMISSORY ESTOPPEL

¶24 TAM next asserts that the trial court erred in dismissing its promissory estoppel claim. We disagree.

¶25 To obtain recovery based on promissory estoppel, a plaintiff must establish five elements: "(1) A promise that (2) the promisor should reasonably expect to cause the promisee to change his position and (3) that does cause the promisee to change his position (4) justifiably relying upon the promise, in such a manner that (5) injustice can be avoided only by enforcement of the promise." *Elliott Bay Seafoods, Inc. v. Port of Seattle*, 124 Wn. App. 5, 13, 98 P.3d 491 (2004).

¶26 "Promissory estoppel requires the existence of a promise. A promise is 'a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made.' " *Havens v. C&D Plastics, Inc.*, 124 Wn.2d 158, 172, 876 P.2d 435 (1994) (citation omitted) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 2(1) (1981) and citing RESTATEMENT § 90 cmt. a (referring to "promise" definition in section 2)).

¶27 TAM argues that NNA's application process required TAM to provide NNA with substantial documentation to establish TAM's qualifications as a dealer. TAM again relies on former RCW 46.96.200(1), reiterating that under the Franchise Act, NNA may not unreasonably withhold its approval of TAM as a dealer. Applying this Franchise Act overlay to TAM's application procedure, TAM contends that Nissan made an *implicit* promise to act in good faith in accepting or rejecting TAM's application.

¶28 TAM's argument is not convincing. TAM cites no authority for the proposition that an implied promise is sufficient to meet the first required element of a promissory estoppel claim. Indeed, promissory estoppel requires a "promise" defined as a " 'manifestation of intention,' " that is, a *demonstration* or display of the promisor's intent. *Havens*, 124 Wn.2d at 172 (quoting RESTATEMENT § 2(1) and citing RESTATEMENT § 90 cmt. a (referring to "promise" definition in section 2)). Under this definition of a "promise," such *display* of intent must necessarily be explicit rather than implicit. And "although promissory estoppel may apply in the absence of mutual assent or consideration, the doctrine may not be used as a way of supplying a promise." *Havens*, 124 Wn.2d at 173. Nor is a general duty to act honestly in the contract setting what is contemplated for promissory estoppel.[2]

---

[2] TAM seems to confuse the requisite promise required under promissory estoppel with the implied duty of good faith and fair dealing that exists in every contract. *See Badgett v. Sec. State Bank*, 116 Wn.2d 563, 569, 807 P.2d 356 (1991). The latter duty requires that the parties perform the obligations imposed by their agreement in good faith. *Badgett*, 116 Wn.2d at 569. Such duty does not inject substantive terms into the parties' contract or create a free-floating duty of good faith unattached to the underlying legal document. *Badgett*, 116 Wn.2d at 569-70. Thus, the duty to cooperate exists only in relation to the performance of specific contract terms to which the parties have agreed. *Badgett*, 116 Wn.2d at 570; *see also Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 86 Wn. App. 732, 738-39, 935 P.2d 628 (1997) (covenant of good faith applies when the contract gives one party discretionary authority to determine a contract term, but it does not apply to contradict a term or condition for which a party has bargained). In any event, the duty of good faith implied in every contract is not at issue here as there is no contract between NNA and TAM.

¶29 Here, the evidence adduced at summary judgment showed that the only manifestation of NNA's intent regarding TAM's dealership application was NNA's explicit notice to both Puyallup Nissan and TAM that its inquiries of TAM "do[ ] not constitute approval [or] acceptance" of TAM as a dealer. Clerk's Papers (CP) at 174 (boldface omitted). TAM also expressly acknowledged that NNA supplied an application packet to TAM "as a convenience only, and [NNA] shall not incur any obligation or liability by receipt of [TAM's] application." CP at 179. Here there is no evidence of a promise to support TAM's promissory estoppel claim. Accordingly, we hold that the trial court did not err in dismissing TAM's promissory estoppel claim against NNA. *See Young*, 112 Wn.2d at 225.

V.  UNILATERAL CONTRACT

¶30  TAM next contends that NNA breached a unilateral contract with TAM. We again disagree.

¶31  "A unilateral contract consists of a promise on the part of the offeror and performance of the requisite terms by the offeree." *Multicare Med. Ctr. v. Dep't of Soc. & Health Servs.*, 114 Wn.2d 572, 583, 790 P.2d 124 (1990) (citing *Higgins v. Egbert*, 28 Wn.2d 313, 317, 182 P.2d 58 (1947)). That is, in a unilateral contract,[3] "an offer cannot be accepted by promising to perform; rather, the offeree must accept, if at all, by performance, and the contract then becomes executed." *Multicare Med. Ctr.*, 114 Wn.2d at 584. The party asserting the existence of a unilateral contract has the burden of proving each essential element of a unilateral contract. *Multicare Med. Ctr.*, 114 Wn.2d at 584 n.19.

¶32 TAM focuses on its performance in providing extensive documentation at NNA's request so that NNA

---

[3] The difference between a unilateral contract and a bilateral contract is the method of acceptance. In a bilateral contract, the parties' exchange of promises to perform makes the contract binding; but in a unilateral contract, the offeror's promise does not become binding or enforceable until there is performance by the offeree. *Multicare Med. Ctr.*, 114 Wn.2d at 584.

could evaluate TAM as a potential dealer. TAM asserts, without citation to the record, that "[NNA] entered into a unilateral contract in which it agreed to approve the sale of existing dealerships to qualified buyers, and to appoint such qualified buyers as Nissan dealers." Br. of Appellant at 22. But NNA expressly disavowed any such promise in writing to both Puyallup Nissan and TAM when NNA requested information to evaluate TAM as a potential dealer. And TAM expressly acknowledged that NNA did not incur any obligation or liability by providing TAM with the dealer application packet or in accepting that application packet for review. Also, in TAM's owner's declaration, submitted in response to NNA's motion for summary judgment, there is no mention of any promise from NNA to TAM.

¶33 We hold that the trial court did not err in dismissing TAM's unilateral contract claim. *See Young*, 112 Wn.2d at 225.

VI. THIRD-PARTY BENEFICIARY

¶34 Tam also contends that it is a third-party beneficiary of NNA's dealership contract with Puyallup Nissan and that the trial court erred in granting summary judgment to NNA on its third-party beneficiary claim. We disagree.

¶35 "The creation of a third party beneficiary agreement requires that the parties intend, at the time they enter into the agreement, that the promisor assume a direct obligation to the beneficiary." *Deep Water Brewing, LLC v. Fairway Res. Ltd.*, 152 Wn. App. 229, 255, 215 P.3d 990 (2009) (citing *Lonsdale v. Chesterfield*, 99 Wn.2d 353, 361, 662 P.2d 385 (1983)). " 'If the terms of the contract necessarily require the promisor to confer a benefit upon a third person, then the contract, and hence the parties thereto, contemplate a benefit to the third person.' " *Lonsdale*, 99 Wn.2d at 361 (emphasis omitted) (internal quotation marks omitted) (quoting *Vikingstad v. Baggott*, 46 Wn.2d 494, 496, 282 P.2d 824 (1955)).

¶36 "The test for intent is an objective one—whether performance under the contract would necessarily and directly benefit that party. 'The contracting parties' intent is determined by construing the terms of the contract as a whole, in light of the circumstances under which it is made.' " *Deep Water Brewing*, 152 Wn. App. at 256 (citation omitted) (quoting *Postlewait Constr., Inc. v. Great Am. Ins. Cos.*, 106 Wn.2d 96, 99-100, 720 P.2d 805 (1986)); *see also Kim v. Moffett*, 156 Wn. App. 689, 699, 234 P.3d 279 (2010).

¶37 Here, NNA and Puyallup Nissan entered into a dealership contract in 1989. The dealership agreement provided in part:

> In view of the fact that this is a personal services agreement and in view of its objectives and purposes, this Agreement and the rights and privileges conferred on Dealer hereunder are not assignable, transferable or salable by Dealer, and no property right or interest is or shall be deemed to be sold, conveyed or transferred to Dealer under this Agreement. Dealer agrees that any change in ownership of Dealer specified herein requires the prior written consent of [NNA].

CP at 50. The Nissan Dealer Sales and Service Agreement's standard provisions provided that "[NNA] has the right and obligation to evaluate each prospective dealer, its owner(s) and executive, manager, the dealership location and the dealership facilities to ensure that each of the foregoing is adequate to enable Dealer to meet its responsibilities hereunder." CP at 102. The standard provisions also provided that "[a]ny purported transfer, assignment, or delegation made without prior written approval of [NNA] shall be null and void." CP at 105. Finally, the dealership agreement specifically disavowed any benefit to any third party, stating, "This Agreement is entered into by and between [NNA] and Dealer for their sole and mutual benefit. Neither this Agreement nor any specific provision contained in it is intended or shall be construed to be for the benefit of any third party." CP at 106.

¶38 The record before the trial court and on appeal is devoid of evidence that NNA and Puyallup Nissan intended that NNA assume a direct obligation to TAM when NNA and Puyallup Nissan entered into their dealership agreement in 1989. Also, in light of the express disavowal of any benefit to any third party, it cannot be said that the dealership agreement read as a whole *necessarily requires* NNA to confer a benefit on TAM. *See Lonsdale*, 99 Wn.2d at 361. Under these circumstances, the trial court did not err in rejecting TAM's assertion that it was a third party beneficiary of NNA and Puyallup Nissan's dealership contract. *See Young*, 112 Wn.2d at 225.

VII.  TORTIOUS INTERFERENCE

¶39 In its cross appeal, NNA contends that the trial court erred in declining to grant NNA summary judgment on TAM's claim of tortious interference with a business expectancy. We agree with NNA and reverse the trial court's decision and remand for it to dismiss this claim.

¶40 A plaintiff claiming tortious interference with a contractual relationship or business expectancy must prove five elements:

> (1) [T]he existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage.

*Leingang v. Pierce County Med. Bureau, Inc.*, 131 Wn.2d 133, 157, 930 P.2d 288 (1997).

¶41 Exercising one's legal interests in good faith is not improper interference. *Leingang*, 131 Wn.2d at 157. "A defendant 'who in good faith asserts a legally protected interest of his own which he believes may be impaired by the performance of a proposed transaction is not guilty of tortious interference.' " *Birkenwald Distrib. Co. v. Heublein,*

*Inc.*, 55 Wn. App. 1, 10, 776 P.2d 721 (1989) (internal quotation mark omitted) (quoting *Brown v. Safeway Stores, Inc.*, 94 Wn.2d 359, 375, 617 P.2d 704 (1980)); *see also Plumbers & Steamfitters Union Local 598 v. Wash. Pub. Power Supply Sys.*, 44 Wn. App. 906, 920, 724 P.2d 1030 (1986) ("[I]nterference [with a business expectancy] is justified as a matter of law if the interferer has engaged in the exercise of an absolute right equal or superior to the right which was invaded.").

¶42 *Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 86 Wn. App. 732, 935 P.2d 628 (1997) is instructive. There, the tire company contracted with a dealer to provide products for sale in the dealer's stores. *Goodyear*, 86 Wn. App. at 736, 746. In the dealer contracts, the tire company reserved the right to open its own stores in the dealer's territory. *Goodyear*, 86 Wn. App. at 736, 746. The tire company ultimately opened such stores and sold its products at competitive prices; the dealer lost customers and went bankrupt. *Goodyear*, 86 Wn. App. at 737-38. When Goodyear sued the dealer-owners individually (as guarantors) for open account balances owed to the tire company, the dealer counterclaimed, asserting, in part, tortious interference with its customer contracts and business opportunities. *Goodyear*, 86 Wn. App. at 737-38.

¶43 On appeal of the summary dismissal of the dealer's counterclaims, Division Three of this court held that the dealer's tortious interference cause of action, "insofar as it relates to Goodyear competing with it, *fails as a matter of law* because Goodyear's alleged 'interference' was not improper." *Goodyear*, 86 Wn. App. at 746 (emphasis added). That result turned on the fact that the dealership contracts unequivocally reserved the tire company's right to compete with the dealer. *Goodyear*, 86 Wn. App. at 746.

¶44 The dealer also alleged that one of its employees had resigned his position and immediately began working for the Goodyear store, in violation of a noncompete agreement. *Goodyear*, 86 Wn. App. at 746. The dealer alleged that he

complained about the noncompete violations to Goodyear, who assured him that such activity would stop. *Goodyear*, 86 Wn. App. at 746. In its briefing to the trial court, the dealer identified customers the former employee solicited from the dealer and attached Goodyear sales invoices bearing the former employee's initials showing sales within the geographic area and during the time period, in violation of the noncompete agreement. *Goodyear*, 86 Wn. App. at 746. Division Three held that the trial court erred in dismissing the dealer's cause of action for tortious interference "but only with respect to the allegations concerning [the dealer's former employee]." *Goodyear*, 86 Wn. App. at 747.

¶45 Here, the dealership agreement between NNA and Puyallup Nissan expressly provides that any transfer of the dealership is subject to NNA's approval. The asset purchase agreement between Puyallup Nissan and TAM also acknowledged NNA's approval contingency. Accordingly, TAM's tortious interference claim, premised on NNA's withholding its consent to the sale of the dealership, fails as a matter of law. *See Goodyear*, 86 Wn. App. at 746; *see also Birkenwald*, 55 Wn. App. at 10; *Broten v. May*, 49 Wn. App. 564, 569, 744 P.2d 1085 (1987) (plaintiff alleging tortious interference regarding real estate commission had no reasonable expectancy in commission where defendant had a right to withhold its consent to commission sharing arrangement and did so).[4] Under these facts, we hold that the trial court erred in denying summary dismissal of TAM's tortious interference claim. *See Young*, 112 Wn.2d at 225.

VIII. LOST PROFITS

¶46 Finally, NNA also contends in its cross appeal that the trial court erred in declining to grant NNA summary

---

[4] TAM at most alleges that NNA is mistaken about its conclusions regarding TAM's performance record. But TAM makes no allegation that NNA's withholding of consent is for an improper motive. "When one acts to promote lawful economic interests, bad motive is essential, and incidental interference will not suffice" to sustain a tortuous interference claim. *Birkenwald*, 55 Wn. App. at 11; *see also Leingang*, 131 Wn.2d at 157 ("[E]xercising in good faith one's legal interests is not improper interference.").

judgment on TAM's lost profits claim. We again agree with NNA and reverse the trial court's ruling and remand to the trial court for dismissal of this claim as well.

■■■ ¶47 Lost profits may be recovered as damages when they are (1) within the contemplation of the parties at the time the contract was entered, (2) the proximate result of defendant's breach, and (3) proved with reasonable certainty. *Tiegs v. Watts*, 135 Wn.2d 1, 17-18, 954 P.2d 877 (1998). NNA argues that TAM's alleged lost profits damages were speculative because TAM had never operated a Nissan dealership. NNA also asserts that future profits could not have been within TAM's contemplation (expectation) when it entered into the proposed asset sale agreement with Puyallup Nissan because that agreement was expressly contingent on NNA's approval.

¶48 Fundamentally, the alleged lost profits must be the proximate result of defendant's breach of an agreement. *Larsen v. Walton Plywood Co.*, 65 Wn.2d 1, 15, 390 P.2d 677, 396 P.2d 879 (1964). Here NNA has no agreement with TAM and it has not breached any agreement. NNA merely exercised its contract rights to evaluate and accept or reject a prospective purchaser of one of its dealer's assets. NNA exercised a contract right that all participants acknowledged. And there is no indication or allegation that NNA's decision to withhold its consent involved any bad motive or wrongful purpose.[5] Because the threshold breach of contract requirement is not met, we hold that the trial court erred in denying summary dismissal of TAM's lost profits claim. *See Young*, 112 Wn.2d at 225.

¶49 TAM has failed to show evidence of an essential element for each of its common law claims. Accordingly, reversal is required regarding the two claims that the trial

---

[5] "If a plaintiff has produced the best evidence available, and if the evidence affords a reasonable basis for estimating the loss, courts will not permit a wrongdoer to benefit from the difficulty of determining the dollar amount of loss." *Lundgren v. Whitney's, Inc.*, 94 Wn.2d 91, 98, 614 P.2d 1272 (1980) (citing *Reefer Queen Co. v. Marine Constr. & Design Co.*, 73 Wn.2d 774, 781, 440 P.2d 448 (1968)). Here, NNA did not act improperly.

court denied summary judgment on tortuous interference and damages (lost profits).

¶50 We affirm the trial court's order granting summary judgment dismissal of TAM's claims for violation of the Franchise Act and for the additional claims based on promissory estoppel, breach of a unilateral implied contract, and a third-party beneficiary theory. We reverse the trial court's denial of summary judgment on TAM's claims of tortious interference and damages for lost profits and remand for dismissal of TAM's suit.

QUINN-BRINTNALL and PENOYAR, JJ., concur.

Review denied at 175 Wn.2d 1024 (2012).