IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| IRWIN-YAEGER, INC. d/b/a SUMMIT MECHANICAL, a Washington corporation, | ) ) ) ) | No. 32204-1-III |
| Appellant, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| WASHINGTON STATE COMMUNITY COLLEGE DISTRICT 17, COMMUNITY COLLEGES OF SPOKANE, an administrative agency of the State of Washington, | ) ) ) ) ) ) ) | |
| Respondent. | ) ) ) | |

KORSMO, J. — The Community Colleges of Spokane (CCS) directed that the winning bidder on a classroom building contract replace the listed plumbing subcontractor, Irwin-Yaeger d/b/a Summit Mechanical. Summit's suit for tortious interference with a business expectancy and defamation was dismissed on summary judgment. We affirm.

## FACTS

CCS requested bids for a classroom building contract at Spokane Falls Community College (SFCC). T.W. Clark Construction, LLC (TWC) submitted the low bid. TWC listed Summit as the plumbing subcontractor on the project.

In part, Section 5.20(B) of the bid contract stated:

> <u>Provide names of Subcontractors and use qualified firms</u>: Before submitting the first Application for Payment, Contractor shall furnish in writing to Owner the names, addresses, and telephone numbers of all Subcontractors, as well as suppliers providing materials in excess of $2,500. *Contractor shall utilize Subcontractors and suppliers which are experienced and qualified*, and meet the requirements of the Contract Documents, if any. *Contractor shall not utilize any Subcontractor or supplier to whom the Owner has a reasonable objection*, and shall obtain Owner's written consent before making any substitutions or addition.

Clerk's Papers (CP) at 49 (emphasis supplied).

CCS had worked with Summit on three prior occasions. Dennis Dunham, the District Director of Facilities for CCS, was dissatisfied with Summit's past work as well as its response to complaints about deficiencies in that work. CCS maintained a large file concerning Summit's work; much of it was devoted to problems with toilets in the Science Building at Spokane Community College (SCC). CP 1-400. Included in those materials was a letter from the contractor for the SCC Science Building, Lydig Construction, acknowledging problems with some of the toilets and directing Summit to make repairs. CP at 209.

2

Upon seeing the bid from TWC, Dunham sought information from Cheryl Groth, the District's Director of Capital Projects and its former Director of Facilities, as well as CCS maintenance personnel familiar with Summit's work. Correspondence and emails among these parties, and then with Enterprise Services, the state agency overseeing construction projects, are the primary source of Summit's litigation claims. According to Summit, the most significant exchanges are the following:

> (a) "These problems extended from poor quality, code compliance issues, scheduling issues, to warranty response issues"; (b) "the worst problem was that of over-all substandard workmanship, resistance to resolving problems when they arose and generally skirting project specifications and code requirements when-ever [sic] possible"; (c) "Summit . . . did not install the toilet carriers per manufacturer's specs or per acceptable construction standards"; (d) "Over the course of two years, I tried to get them to correct their shoddy workmanship, and I found them to be evasive, dishonest, and lacked professional integrity." (e) "Mark [Connolley] also said, that he had heard, that Summit is so upside down that they could not afford to make bond that the general would have to for them."

CP at 41, 53, 54, 57, 58; *See* Br. of Appellant at 25.

After consulting with the CCS employees, Dunham communicated with Dave Lohrengel of the Department of Enterprise Services protesting the use of Summit in light of the history of problems. The low bid from TWC was selected, but TWC was ordered to replace Summit with the next lowest plumbing contractor. Summit responded with this litigation.

CCS eventually moved for summary judgment, relying upon its contractual right to substitute subcontractors in response to the tortious interference claim and that there

was no publication of the alleged defamatory statements by the in-house discussion among state employees. The trial court granted the motion, concluding that there was no evidence that CCS used improper means or acted with an improper purpose and that there was no evidence of publication of the allegedly defamatory statements or that CCS acted with malice.

An order was entered dismissing the complaint. Summit then timely appealed to this court.

## ANALYSIS

Summit challenges both bases for the summary judgment ruling, contending that there are factual questions that require the case to proceed to trial. We address first the defamation issue before turning to the tortious interference claim. Initially, however, it is appropriate to state the standards governing review of summary judgment rulings.

This court reviews a summary judgment de novo, performing the same inquiry as the trial court. *Lybbert v. Grant County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000). The facts, and all reasonable inferences to be drawn from them, are viewed in the light most favorable to the nonmoving party. *Id.* If there is no genuine issue of material fact, summary judgment will be granted if the moving party is entitled to judgment as a matter of law. *Id.* "A defendant in a civil action is entitled to summary judgment if he can show that there is an absence or insufficiency of evidence supporting an element that is essential to the

4

plaintiff's claim." *Tacoma Auto Mall, Inc. v. Nissan N. Am., Inc.*, 169 Wn. App. 111, 118, 279 P.3d 487 (2012).

The moving party bears the initial burden of establishing that it is entitled to judgment because there are no disputed issues of material fact. *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). If a defendant makes that initial showing, then the burden shifts to the plaintiff to establish there is a genuine issue for the trier of fact. *Id.* at 225-26. "A material fact is one that affects the outcome of the litigation." *Owen v. Burlington N. & Santa Fe R.R.*, 153 Wn.2d 780, 789, 108 P.3d 1220 (2005). While questions of fact typically are left to the trial process, they may be treated as a matter of law if "reasonable minds could reach but one conclusion" from the facts. *Hartley v. State*, 103 Wn.2d 768, 775, 698 P.2d 77 (1985). A party may not rely on speculation or having its own affidavits accepted at face value. *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986). Instead, it must put forth evidence showing the existence of a triable issue. *Id.*

### *Defamation*

To establish a defamation claim, a plaintiff must establish four elements: (1) falsity, (2) an unprivileged communication, (3) defendant's fault, and (4) damages. *Mohr v. Grant*, 153 Wn.2d 812, 822, 108 P.3d 768 (2005). Even a privileged communication, however, can be abused. In such a case, "a showing of actual malice will defeat a conditional or qualified privilege." *Herron v. Tribune Publ'g Co. Inc.*, 108 Wn.2d 162, 183, 736 P.2d 249 (1987).

"Actual malice must be shown by clear and convincing proof of knowledge or reckless disregard as to the falsity of a statement." *Momah v. Bharti*, 144 Wn. App. 731, 742, 182 P.3d 455 (2008).

Washington recognizes a qualified privilege for the protection of common interest when:

> The publication is for the protection of the interest of the publisher; the recipient or a third person; persons sharing a common interest; family relationships; public interest. In connection with the last mentioned type of privilege the publication is privileged only when made to a public officer or a private citizen who is authorized to act. The privilege does not extend to the publication to the entire public.

*Owens v. Scott Publ'g Co.*, 46 Wn.2d 666, 674, 284 P.2d 296 (1955) (internal citations omitted). "The common interest privilege applies when the declarant and the recipient have a common interest in the subject matter of the communication." *Momah*, 144 Wn. App. at 747. The privilege is generally applicable to partnerships, associations, and organizations that need to speak freely and openly about subjects of organizational or pecuniary interest. *Id.* at 748. Courts have applied the privilege "in cases of limited publication on issues in common between the publisher and recipients." *Id.* (citing *Gem Trading Co., Inc. v. Cudahy Corp.*, 92 Wn.2d 956, 958-59, 603 P.2d 828 (1979) (former employee brought defamation action against employer who told vendors that orders placed by the employee were unauthorized); *Ward v. Painters' Local Union*, 41 Wn.2d 859, 866,

6

252 P.2d 253 (1953) (privilege extended to union members who made written and oral statements that a member had misappropriated funds while an officer of the union).

The parties dispute both the falsity and publication (privileged communication) elements. We need not address the falsity claim because we agree with the trial court that the internal communications among CCS employees and with Enterprise Services was privileged and there was no showing of actual malice.

The common interest privilege applies here because the CCS employees communicated about a matter of organizational interest—the identity of a proposed plumbing subcontractor who wanted to work on the new CCS building at SFCC. The ensuing communications addressed Summit's past performance on earlier CCS projects in order to assess whether to work with them on this project and, subsequently, to protest Summit's involvement when the low bid was awarded. These were all matters of proper organizational interest. Accordingly, the communication among the CCS employees was privileged in this case.

Summit argues that the subsequent communication to Enterprise Services was not privileged and, hence, also supported the defamation claim. Summit contends that because Enterprise Services is a different governmental entity from CCS, it was outside the organizational structure, thus precluding a common interest privilege. Again, we disagree.

Although we question Summit's premise that two divisions of state government constitute separate entities for purposes of publishing and receiving communication, we

7

need not address that issue. The analytical question here is whether the employees of CCS and the employees of Enterprises Services were pursuing a common interest. They were. The bid contract lists Enterprise Services as the contracting agency for the bid while CCS was listed as the client agency. CP at 48. The project was the new classroom building at SFCC. The two agencies were working together on the common project. The communications involved the project. There was the "common interest in the subject matter of the communication" necessary to establish the common interest privilege. *Momah*, 144 Wn. App. at 747. The trial court did not err in concluding that reasonable minds could reach only one conclusion under the facts. This was a communication about a common project and the common interest privilege attached.

The privileged communication thus defeated the defamation claim unless Summit could establish actual malice behind the communication. Summit did not meet that heavy burden.

The CCS employees expressed their opinions on Summit's work based on their previous business dealings with Summit. A third party letter from Lydig Construction supported the CCS employees' opinions. As a result, reasonable minds could not differ that the declarants had reasonable grounds for their opinions and belief. A genuine dispute existed concerning the previous projects, regardless of whether either side was correct in its view of the situation. Additionally, Summit failed to bring forth evidence that such statements were made with malice, asserting instead only that the statements

8

were prompted by Mr. Dunham's request "needing reasons" to replace Summit as the subcontractor. The master contract required that CCS give legitimate reasons for replacing any subcontractor. This does not demonstrate malice, but, rather, an attempt to follow contract provisions and give sufficient cause.

Summit has not established clear and convincing proof of malice. Accordingly, the trial court correctly determined that the common interest privilege applied and it was not defeated by strong evidence of malice. The court properly granted summary judgment on the defamation cause.

### Tortious Interference with a Business Relationship

Summit also contends that the trial court erred in dismissing its tortious interference action, arguing that material questions of fact exist whether CCS acted by an improper means and with an improper purpose when it torpedoed Summit's bid. We will address those two prongs in the order listed.

In order to establish this tort, a plaintiff must satisfy each of five elements: (1) the existence of a valid contractual relationship or business expectancy, (2) that defendants had knowledge of, (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy, (4) that defendants interfered for an improper purpose or used improper means, and (5) damage. *Elcon Constr., Inc. v. E. Wash. Univ.*, 174 Wn.2d 157, 168, 273 P.3d 965 (2012). At issue in the present case is only the fourth element— whether CCS interfered for an improper purpose or used improper means.

This cause of action distills the heart of the case. Summit believes that CCS retaliated against it over an old grudge, using the new project as a way to harm Summit's business. In turn, CCS sees its actions as protecting the public and CCS from substandard work and service by Summit. With these competing views of the case in mind, we turn to the alternative means of establishing the fourth element.

*Improper Means*

The improper means element looks at the method by which a defendant interferes with plaintiff's contractual relationship. An arbitrary and capricious action may constitute an improper means of interference. *Pleas v. City of Seattle*, 112 Wn.2d 794, 805, 774 P.2d 1158 (1989). In contrast, a good faith exercise of one's legal interest is not improper interference. *Tacoma Auto Mall, Inc. v. Nissan N. Am., Inc.*, 169 Wn. App. 111, 132, 279 P.3d 487 (2012).

Summit contends that CCS improperly interfered by violating the terms of the contract and in relation to Washington's competitive bidding statutes and related public policy. The contract based claim involves the language of the two paragraphs addressing subcontractors. In each instance, the provisions require the contractor to use "experienced and qualified" subcontractors, but could not use any to whom "the Owner has a reasonable objection." CP at 49, 50.[1] Summit reads these provisions as requiring any "reasonable

---

[1] Section 5.20(B), CP at 49, was recited verbatim near the beginning of this opinion.

objection" to be based on the experience and qualifications of the subcontractor. We disagree.

A fair reading of the contract provisions indicates that while the "experienced and qualified" language may set a floor for the subcontractors to meet, it does not modify the owner's right to reasonably object to a subcontractor. The owner's objection right is preserved in a separate sentence from the bidder's requirement to use qualified subcontractors. While an objection must be "reasonable," the contract does not limit the objection solely to the experience and qualifications of the subcontractor.

CCS gave several reasons for its objection to Summit. The objection was backed by several years of documentation, from employees of CCS as well as outsiders such as general contractor Lydig Construction, demonstrating problems with Summit's past work for CCS. The objection was reasonable. CCS was not required to accept Summit merely because it had the experience and qualifications required by the contact.

CCS did not act by improper means when it exercised its statutory right to object to Summit participating as a contractor.

Summit also argues that the objection was contrary to the statutes and public policy of Washington's competitive bidding statutes, specifically RCW 39.30.060.[2] In

---

[2] Summit also makes reference to RCW 39.10.380(2), but admits (Reply Brief at p. 13) that the alternative bidding process of RCW 39.10 was not used in this case and relies on these statutes merely as an expression of public policy. As this argument was not presented to the trial court, we will not further address it. RAP 2.5(a).

general, that statute requires contractors to identify the subcontractors it is using, RCW 39.30.060(1), and prohibits "bid shopping or bid peddling" by the contractor, RCW 39.30.060(2). A subcontractor can recover damages from the contractor for violating the provisions of RCW 39.30.060(2). These statutes do not help Summit's position.

RCW 39.30.060 has been expressly interpreted by this court as protecting the public purse rather than the interests of a subcontractor. *McCandlish Elec., Inc. v. Will Constr. Co.*, 107 Wn. App. 85, 97, 25 P.3d 1057 (2001).[3] There we concluded that a contractor is normally required to use the subcontractor listed in the bid and may not bid shop, with an injunction normally to be the subcontractor's remedy. *Id.* at 95. A damages suit against the public was considered a further affront to the public treasury. *Id.* at 97.[4] The legislature responded by enacting RCW 39.30.060(2), creating a damages action for the subcontractor *against the contractor* rather than against the public. LAWS OF 2002, ch. 163, § 2.

---

[3] The language of the statute at the time of *McCandlish* is now found, in large part, in RCW 39.30.060(1). *See* 107 Wn. App. at 94. RCW 39.30.060(2) was added in response to *McCandlish* in order to provide a remedy for subcontractors *against contractors* who bid shop or bid peddle. *See* LAWS OF 2002, ch. 163, §§ 1, 2.

[4] While Summit contends that the public purse was harmed by the change in subcontractors, *McCandlish* still governs that argument. Paying damages would only worsen the harm to the public, contrary to the purpose of the bidding statute. Summit also fails to recognize that its potential poor performance would also damage the public coffers.

12

Thus, the public policy behind this statute does not aid Summit here. Further, nothing in the language of the statute prohibits a public entity from exercising contractual control over subcontractors. CCS reserved that right under the bidding contract and Summit can point to no statutory authority prohibiting the practice. And, since the statute only permits a damage action against the contractor (and only in cases of bid shopping), there is further evidence that the public policy of the bidding statutes does not contemplate Summit's action here.

CCS did not act by an improper means when it exercised its right under the contract to object to Summit participating in the project. The trial court correctly determined that this means of establishing tortious interference was not available in this case.

*Improper Purposes*

Summit also argues that CCS acted with bad motives when it objected to Summit's participation. This aspect of the test focuses on the reasons for a defendant's interference with the contract. We agree with the trial court that Summit failed to establish that CCS acted with improper purpose.

Summit argues that CCS acted with malice because it was upset with Summit over prior jobs. It has been noted that "greed, retaliation, or hostility" will support a finding of improper purpose, but it is the plaintiff's obligation to present evidence of the improper motive. *Elcon*, 174 Wn.2d at 169. Conclusory statements are insufficient. *Id.* Exercising a legal interest in good faith is not an improper interference. *Schmerer v.*

13

*Darcy*, 80 Wn. App. 499, 506, 910 P.2d 498 (1996) (citing RESTATEMENT (SECOND) OF
TORTS § 773 (1977)).

Summit simply does not have the evidence to support its theory of the case that
CCS acted with malice. Malice is not established merely because CCS did not want to
work with Summit any longer. This was a logical business decision supported by several
years of extensive documentation from both within and without CCS. Even if CCS was
incorrect to blame Summit, its action in exercising its contractual right under these
circumstances would establish no more than judgment error. There is no evidence of evil
motive or a desire to harm Summit.

The trial court correctly concluded that no evidence supported the improper
purpose element. Accordingly, summary judgment on the tortious interference claim was
properly granted.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the
Washington Appellate Reports, but it will be filed for public record pursuant to RCW
2.06.040.

Korsmo, J.

WE CONCUR:

Brown, A.C.J.

Fearing, J.

14